## SCULL *v.* VIRGINIA EX REL. COMMITTEE ON LAW REFORM AND RACIAL ACTIVITIES.

No. 51. Argued November 18, 1958.—Decided May 4, 1959.

*Joseph L. Rauh,. Jr.* argued the cause for petitioner. With him on the brief were *John Silard* and *Karl Sorg.*

*Leslie Hall* argued the cause and filed a brief for respondent.

Opinion of the Court by MR. JUSTICE BLACK, announced by MR. JUSTICE HARLAN.

David H. Scull was convicted of contempt in the Circuit Court of Arlington County, Virginia, for refusing to obey a decision of that court ordering him to answer a number of questions put to him by a Legislative Investigative Committee of the Virginia General Assembly. On

appeal the Virginia Supreme Court of Appeals affirmed without opinion. Scull contended at the Committee hearings, in the courts below, and in this Court that the Virginia statute authorizing the investigation, both on its face and as applied, violated the Fourteenth Amendment to the United States Constitution. He claimed, among other things, that: (1) The Committee was "established and given investigative authority, as part of a legislative program of 'massive resistance' to the United States Constitution and the Supreme Court's desegregation decisions, in order to harass, vilify, and publicly embarrass members of the NAACP and others who are attempting to secure integrated public schooling in Virginia." (2) The questions asked him violated his rights of free speech, assembly and petition by constituting an unjustified restraint upon his associations with others in "legal and laudable political and humanitarian causes." (3) "The information sought from [him] was neither intended to, nor could reasonably be expected to, assist the Legislature in any proper legislative function." (4) Despite his requests, repeated at every stage of the proceedings, the Committee failed to inform him "in what respect its questions were pertinent to the subject under inquiry . . . ." We granted certiorari to consider these constitutional challenges to the validity of petitioner's contempt conviction. 357 U. S. 903. After careful consideration, we find it unnecessary to pass on any of these constitutional questions except the last one because we think the record discloses an unmistakable cloudiness in the testimony of the Committee Chairman as to what was sought of Scull, as well as why it was sought. Scull was therefore not given a fair opportunity, at the peril of contempt, to determine whether he was within his rights in refusing to answer and consequently his conviction must fall under the procedural requirements of the Fourteenth Amendment.

Scull is a printer and calendar publisher in Annandale, Virginia, where he has been a long-time resident active in religious, civic and welfare groups. Soon after this Court's decision in *Brown* v. *Board of Education,* 347 U. S. 483, holding segregation in the public schools to be unconstitutional, Scull began to advocate compliance with the requirements of the *Brown* case. In December of 1954, Scull and a group of other citizens met at a church in Alexandria to consider and discuss "the part which concerned and conscientious citizens can best play in helping to achieve the community adjustments necessary to protect the educational and constitutional rights of all citizens as recently defined and interpreted by the Supreme Court of the United States." The group decided to prepare and publish through a "Citizens Clearing House On Public Education" information about the Virginia educational program and to report on the progress made by various Parent-Teacher Associations in Northern Virginia in developing programs for "orderly integration."

One of the newsletters published by the Clearing House was obtained by the Fairfax Citizens' Council, a group which vigorously opposed any desegregation of Virginia schools. The Council republished a large part of the letter in a pamphlet entitled "The Shocking Truth!" It called attention to the fact that the newsletter was being "disseminated through Box 218, Annandale, Va. (David Scull)," and stated that "communications with the N. A. A. C. P., Southern Regional Council, Clearing House, B'nai B'rith, Council on Human Relations, American Friends and many other pro-integration groups are funneled through Box 218, Annandale, Va., and membership is encouraged if not actually suggested by the P. T. A. Federation.".

The pamphlet came to the attention of Delegate James M. Thomson, Chairman of the Virginia Committee on

Law Reform and Racial Activities, who promptly sub-
poenaed Scull to appear and testify. This group, com-
monly called the "Thomson Committee," was established
a few months after the Virginia General Assembly
adopted a resolution attacking the *Brown* decision and
pledging that the Legislature would take all constitution-
ally available measures to resist desegregation in the
public schools.[1] The bill setting up the "Thomson Com-
mittee" was one of a series relating to segregation passed
on the same day. Among these were bills establishing
a pupil-assignment plan, providing for the withdrawal
of state funds from integrated schools and forbidding
barratry, champerty and maintenance.[2] While they did
not mention the NAACP by name, Chairman Thomson
testified below that in the course of the "legislative battle"
over them he had stated that with "this set of bills . . .
'we can bust that organization . . . wide open.'"

Scull appeared before the Thomson Committee, as
ordered. He answered several questions about his pub-
lishing business, and then was asked whether he belonged
"to an organization known as The Fairfax County Coun-
cil on Human Relations." He replied that "on advice of
counsel I wish to state that the language of the subpoena
delivered to me was so broad and vague . . . that before
going further I wish to ask you to tell me the specific sub-
ject of your inquiry today, so that I may judge which of
your questions are pertinent." Chairman Thomson told
him that the general subjects under inquiry were "three-
fold": (1) the tax status of racial organizations and of
contributions to them; (2) the effect of integration or its
threat on the public schools of Virginia and on the State's
general welfare; and (3) the violation of certain statutes

---

[1] See Va. Acts 1956, S. J. Res. 3.

[2] See generally, Va. Acts, E. S. 1956, cc. 31–37, 56–71.

against "champerty, barratry, and maintenance, or the unauthorized practice of the law." [3]   He told Scull, however, that several of these subjects "primarily do not deal with you."   Scull then filed a statement of his objections to the questioning and emphasized that he had not been "properly informed of the subject of inquiry."   Without clarifying Chairman Thomson's ambiguous statement or specifying which of the "several" subjects did not apply to Scull, the Committee proceeded to ask the 31 questions listed in the footnote below.[4]

---

[3] The Committee was authorized to: "make a thorough investigation of the activities of corporations, organizations, associations and other like groups which seek to influence, encourage or promote litigation relating to racial activities in this State.   The Committee shall conduct its investigation so as to collect evidence and information which shall be necessary or useful in

"(1) determining the need, or lack of need, for legislation which would assist in the investigation of such organizations, corporations and associations relative to the State income tax laws;

"(2) determining the need, or lack of need, for legislation redefining the taxable status of such corporations, associations, organizations and other groups, as above referred to, and further defining the status of donations to such organizations or corporations from a taxation standpoint; and

"(3) determining the effect which integration or the threat of integration could have on the operation of the public schools in the State or the general welfare of the State and whether the laws of barratry, champerty and maintenance are being violated in connection therewith."   Va. Acts, E. S. 1956, c. 37.

[4] (1) "Are you a member of The Fairfax County Council on Human Relations?"

(2) "Are you a member of the National Association for the Advancement of Colored People?"

(3) "Have you contributed to any of the suits, contributed financially to any of the suits designed to bring about racial integration in the public schools?"

(4) "Have you paid court costs in any of the suits designed to bring about racial integration in the State of Virginia?"

(5) "Have you paid attorneys' fees to any attorneys in regard to

It is difficult to see how some of these questions have any relationship to the subjects the Committee was authorized to investigate, or how Scull could possibly discover any such relationship from the Chairman's state-

racial litigation involved in the integration of the public schools in Virginia?"

(6) "Have you attended any meetings at which the formulation of suits against the State of Virginia in racial integration suits in the public schools have been discussed?".

(7) "I notice in your statement that you say that you think you have a moral duty to counsel with a fellow citizen as to his legal rights if he is ignorant of them. Do you feel qualified to counsel with him as to his legal rights?"

(8) "Who else uses that box number [No. 218 in Annandale, Va.] besides yourself?"

(9) "Does the Fairfax County Council on Human Relations use that box?"

(10) "Has the NAACP used that number from time to time?"

(11) "Has the organization known as the Citizens Clearing House used that box number?"

(12) "Has the Fairfax County Federation of PTA's used that number?"

(13) "Has the Fairfax County Federation of P-TA Workshops on Supreme Court Decisions on the Public Schools used that box number?"

(14) "Has Miss Caroline H. Planck or Mrs. Barbara Marx used that box number?"

(15) "Do you know Mrs. Planck or Mrs. Marx?"

(16) "Has Dr. E. B. Henderson used that box number?"

(17) "Has the National Conference of Christians and Jews used that box number?"

(18) "Has the Save Our Schools Committee of Fairfax County used that box number?"

(19) "Has Mr. Warren D. Quenstedt used that box?"

(20) "Has Mr. E. A. Prichard used that number?"

(21) "Has the American Civil Liberties Union used that same box number?"

(22) "Has the Americans For Democratic Action, known as ADA, used that box number?"

ment.[5] It does seem that several of the questions asked were aimed at connecting Scull with barratry or champerty, but it was never made wholly clear to Scull, either before or after the questioning, that this was one of the subjects under inquiry as far as he was concerned. Nevertheless, Scull was cited to appear before the Circuit Court to show cause why he should not be compelled to answer.

In the Circuit Court the Chairman sought to explain his ambiguous statements about the scope of the investigation. Far from clarifying the matter, however, his

---

(23) "Has the Japanese-American Citizens League used that box number?"

(24) "Has the Washington Inter-Racial Workshop used that same number?"

(25) "Has the American Friends Service Committee used that box number?"

(26) "Does the Community Council for Social Progress use the same box number?"

(27) "Does B'nai Brith use that same box number?"

(28) "Does the Communist Party use that box number?"

(29) "Do you belong to any racial organization, and by 'racial' I mean organizations whose membership is interracial in character or organizations that are instituting or fostering racial litigation?"

(30) "Have you ever been called as a witness before any Congressional Committee?"

(31) "Has your name ever been cited by any Congressional Committee as being on any list of members of any organizations that are cited as subversive?"

[5] Question 28 asked if the Communist Party used Box 218; Question 30 asked if Scull had ever been called as a witness before a Congressional Committee; Question 31 asked if his name had ever been cited by any Congressional Committee as being on any list of members of any organizations that are cited as subversive. Nothing in the language of the Act authorizing the Committee or in the statement of Chairman Thomson about the subjects under inquiry could lead Scull to think that it was the Committee's duty to investigate Communist or subversive activities.

testimony added to the confusion, since he successively ruled out as inapplicable to Scull each of the subjects which the Legislature had authorized the Committee to investigate. On first being asked which of the three subjects applied to Scull, he testified:

For my personal standpoint, I would say that the one dealing with the taxable status does not affect him here, and likewise the one—I have forgotten whether I stated it or not, but I would think that the integration or the threat of integration on public school systems, on the general welfare, would apply.

"Looking at it in retrospect, the other on champerty, barratry, and maintenance would not apply. I don't recall whether I did say or did not say. We did specifically with the third one: Champerty, barratry, and maintenance."

Later the following colloquy took place:

Counsel for Scull: "Q. Now, is it also correct that you said several which primarily do not deal with you?"

Chairman Thomson: "A. If the transcript says it there, I said it.

"Q. Which of those three were you referring to when you said, 'Several which primarily do not deal with you'?

"A. I think it is the last mentioned there. [The last mentioned was barratry.]

"Q. Would you just state for the record so that it is clear on the record which ones you were referring to that did not deal with Mr. Scull?

"A. The violation of those statutes dealing with champerty, barratry, and maintenance, and general unauthorized practice of the law.

"Q. Those did not deal with Mr. Scull?

"A. No, no; I think in the connection that we are dealing with here, that the ones spoken of first did not apply; only the latter one did apply that I was making.

"Q. Now I am confused."

Subsequently, Chairman Thomson stated that barratry applied to a certain "section of the testimony" but did not identify which section. Still later he undertook to specify the section but instead of doing so he made what may have been a general retraction and said, "The whole statement would be applicable to the entire transcript and the fact that he was advised of each one of them would be applicable to the entire transcript."

The judge who ordered Scull to answer the questions made no clearer statement of their pertinence to the investigation or to basic state interests than had the Committee Chairman. His holding was merely that "the questions are of a preliminary nature and in developing the inquiry to secure the information which the Committee is after appears to the Court to be perfectly proper line of inquiry." He at no time analyzed the individual questions asked, nor explained to Scull what it was that the Committee wanted from him and how the questions put to him related to these desires.

The events leading to Scull's subpoena, as well as the questions asked him, make it unmistakably clear that the Committee's investigation touched an area of speech, press, and association of vital public importance.[6] In *NAACP* v. *Alabama*, 357 U. S. 449, 460–466, this Court

---

[6] See *NAACP* v. *Alabama*, 357 U. S. 449, 460–466; *United States* v. *Rumely*, 345 U. S. 41. Among the questions asked were several dealing directly with political activity. Question 19, for example asked if Mr. Warren D. Quenstedt, a candidate for Congress had used Scull's post-office box.

held that such areas of individual liberty cannot be invaded unless a compelling state interest is clearly shown.[7]   But we do not reach that question because the record shows that the purposes of the inquiry, as announced by the Chairman, were so unclear, in fact conflicting, that Scull did not have an opportunity of understanding the basis for the questions or any justification on the part of the Committee for seeking the information he refused to give.   See *Watkins* v. *United States,* 354 U. S. 178, 208–209, 214–215.   To sustain his conviction for contempt under these circumstances would be to send him to jail for a crime he could not with reasonable certainty know he was committing.   This Court has often held that fundamental fairness requires that such reasonable certainty exist.   See *Lanzetta* v. *New Jersey,* 306 U. S. 451, 453; *Jordan* v. *De George,* 341 U. S. 223, 230; *Watkins* v. *United States,* 354 U. S. 178, 208–209, 214–215, 217; *Flaxer* v. *United States,* 358 U. S. 147, 151.   Certainty is all the more essential when vagueness might induce individuals to forego their rights of speech, press, and association for fear of violating an unclear law. *Winters* v. *New York,* 333 U. S. 507.   Such is plainly the case here.   The information given to Scull was far too wavering, confused and cloudy to sustain his conviction.

The case is reversed and remanded to the Virginia Supreme Court of Appeals for further proceedings not inconsistent with this opinion.

*Reversed.*

---

[7] Four members of this Court adhere to the view they expressed in *Sweezy* v. *New Hampshire,* 354 U. S. 234, 251, and "do not now conceive of any circumstances wherein a state interest would justify infringement of rights in these fields."