IN THE MATTER OF THE APPLICATION OF THE WATER-FRONT COMMISSION OF NEW YORK HARBOR TO PUNISH ANTHONY MARCHITTO FOR FAILURE TO OBEY A SUBPOENA.

ANTHONY MARCHITTO, APPELLANT, AND WATERFRONT COMMISSION OF NEW YORK HARBOR, RESPONDENT.

Argued March 9, 1960—Decided May 9, 1960.

324

*Mr. James H. Dowden* argued the cause for the appellant.

*Mr. Robert A. Pin* argued the cause for the respondent (*Mr. William P. Sirignano,* of the New York Bar, and *Mr. Irving Malchman,* of the New York Bar, on the brief).

The opinion of the court was delivered by

PROCTOR, J. This is an appeal (1) from a judgment of the Superior Court, Law Division, dated October 9, 1959, which held the appellant Anthony Marchitto guilty of civil contempt for his failure to appear and testify before the Waterfront Commission of New York Harbor, in response to a subpoena served upon him by the Commission, and (2) from an order of the same court, dated the same day, denying Marchitto's motion to quash the subpoena. We certified the cause while it was pending in the Appellate Division.

The Commission's subpoena was served personally upon the appellant on July 1, 1959. It commanded him

"to appear before the Waterfront Commission of New York Harbor as a witness and to testify in the matter of an investigation being conducted under Article IV of the Waterfront Commission Compact, at the offices of the Waterfront Commission of New York Harbor, 15 Park Row, 21st Floor, New York 38, New York at 2:30 o'clock in the afternoon of the 6th day of July 1959, and at any adjourned date thereof."

The return day of the subpoena was adjourned by consent. On the later return day Marchitto did not appear. His counsel appeared, however, and requested information as to the specific nature of the investigation. He was told that the information would not be given until Marchitto responded to the subpoena.

On July 27, 1959, counsel for Marchitto informed the Commission by letter that he would contest the legality of the subpoena on the ground that the Commission lacked jurisdiction of the subject matter of its proposed investigation. On August 28, the Commission obtained an order to show cause why Marchitto should not be held in contempt.

In the Commission's motion for the order to show cause, verified by affidavits, it was stated:

"4. The Commission received information that a charter for Local 1823 of the ILA had been granted by the ILA to certain notorious hoodlums and criminals to organize white collar workers in industrial plants in New Jersey and Pennsylvania. The Commission also received information that the organizer for Local 1823 was one Frank Campbell, a notorious waterfront hoodlum and criminal who had been denied registration by the Commission to work on the waterfront as a longshoreman. (Under the Waterfront Commission Act, longshoremen and others in the Port of New York district must be licensed or registered by the Commission.) Campbell's extensive criminal record is annexed hereto as 'Exhibit A.' In addition, the Commission received information that one Anthony Marchitto was an officer of Local 1823, and also an associate of the notorious Frank Campbell.

5. Consequently, in order to ascertain the facts concerning the issuance of charters by the ILA to criminal elements and to further ascertain what influence and control such criminal elements have in the ILA, the Commission duly instituted an investigation of these matters."

Marchitto appeared with his counsel at the hearing of the order to show cause. Counsel for the Commission restated the purpose of the investigation and the statutory power of the Commission to conduct it. Marchitto's counsel conceded that his client had been properly served, but argued that the Commission had to prove its jurisdiction of the subject matter before the witness could be compelled to testify. He contended the moving papers failed in this requirement because they referred only to the efforts of Local 1823 to organize white collar workers, who had no connection with the waterfront, and therefore the investigation was beyond the jurisdiction of the Commission. He also requested permission to "cross-examine the persons who were going to present the proofs to the Court concerning the basis of the jurisdiction of the Commission in this particular matter."

At the conclusion of the argument, the trial court held that the Commission had the power to issue the subpoena and adjudged Marchitto to be in civil contempt. The court

withheld punishment, however, and gave Marchitto the opportunity to purge himself of the contempt by appearing before the Commission. It refused to direct Marchitto to testify, saying: "If he fails to testify he will, of course, have to give reasons for not testifying and that must be litigated in a different forum." It is apparent from the record that the trial judge's refusal to order Marchitto to testify was due to his understandable lack of knowledge of the questions to be asked, and his recognition of the witness' right to object to specific questions.

Marchitto appeared before the Commission on September 25, 1959, but he refused to be sworn until he was fully informed of the subject matter of the investigation. Marchitto's counsel stated, "I want to hear what the preliminary statement is before I have my client do anything," and he contended that the question of the Commission's jurisdiction had not been decided by the court. He conceded, however, that the papers filed in court "in and of themselves apprise me of what is generally the subject matter." Counsel for the Commission told Marchitto that after being sworn he would be informed of the subject matter of the investigation and the scope of the examination, but that such information had nothing to do with his being sworn. After Marchitto's repeated refusals to be sworn, the hearing was adjourned.

The Commission then moved for a judgment punishing Marchitto for contempt. At the hearing before the trial court on October 2, 1959, Marchitto again contended that before the Commission could interrogate him, it would first have to establish its jurisdiction of the subject matter. The trial court held that the Commission had "the legal right and jurisdiction to issue the subpoena" and again adjudged Marchitto to be in civil contempt, but gave him another opportunity to purge himself by appearing before the Commission and being sworn. After conferring with his client, counsel for Marchitto stated that his client did not choose to take advantage of the opportunity offered him. There-

upon, the court renewed its determination of guilt and sentenced Marchitto to 30 days in the Hudson County Jail, but stayed judgment pending appeal on $2,500 bail.

On the same day, Marchitto served the Commission with a motion to quash the subpoena on the grounds (a) that it failed to establish "subject matter jurisdiction" and to inform Marchitto with sufficient clarity of the nature of the investigation, and (b) that the Commission did not comply with Marchitto's subsequent request to reveal the nature of the investigation. Shortly thereafter, the Commission moved to correct the sentence imposed by the court on October 2, 1959.

On October 9, 1959, the trial court took up both motions. It denied Marchitto's motion to quash the subpoena, revoked the 30-day sentence previously imposed, and instead fined Marchitto $50 and directed that he be committed to jail until he obeyed the subpoena and paid the fine, or until further order of the court. Again the trial court stayed the judgment pending appeal on $2,500 bail.

On this appeal, Marchitto attacks the trial court's determination to hold him in contempt, and its refusal to quash the subpoena. He makes three arguments, (1) that he was denied procedural due process of law by being held in contempt solely upon the Commission's *ex parte* proof to the trial court of its jurisdiction to conduct its present investigation and to compel his appearance, (2) that he could not be constitutionally held in contempt for failure to testify, since the Commission did not give him sufficient information to enable him to determine the pertinency of the questions to be asked him, and (3) that the subpoena was fatally defective because it failed to inform him of the nature of the investigation.

We find the appellant's first contention to be without merit. The Commission established by sufficient proofs in the court below its statutory authority to undertake the present investigation, and to require Marchitto's testimony in connection with it.

■ The Waterfront Commission Act is an interstate compact, enacted by the States of New York and New Jersey (*N. Y. Laws* 1953, *c.* 882, *McKinney's Unconsolidated Laws*, § 6700*aa et seq.*); *L.* 1953, *c.* 202, *c.* 203, *N. J. S. A.* 32:23–1 *et seq.*, with the consent of Congress, 67 *Stat.* 541, Act of August 12, 1953, *c.* 407, in order to eliminate evil conditions on the waterfront in the Port of New York Harbor. The principal evil sought to be eliminated was the domination by criminal elements of the International Longshoremen's Association, which represents waterfront labor. Justice Brennan (now of the United States Supreme Court), speaking for this court in *Hazelton v. Murray,* 21 *N. J.* 115, at *page* 120 (1956), discussed the threat posed by these criminal elements:

"This threat lay in the fact that criminals, racketeers and hoodlums had acquired a stranglehold upon port activities through their control of key positions in a large number of the 64 locals of the International Longshoremen's Association (eleven of the locals were New Jersey locals), which numbered in its membership not alone the longshoremen but as well the pier superintendents and hiring agents who employed and supervised their work;

\* \* \* \* \* \* \* \*

The public hearings on the *New York Crime Commission's Fourth Report*, conducted by Governor Dewey on June 8 and 9, 1953, developed the fact, as one witness phrased it, that '\* \* \* it is certain and evident that the ILA in this harbor is a racket union'; \* \* \* The *Fourth Report* recounts 'the exploitation and betrayal of the rank and file dock worker by his ILA officials and representatives,' p. 19; 'It was established that at least 30 per cent of the officials of the ILA Longshoremen locals have police records. Waterfront criminals know that the control of the local is a prerequisite to conducting racket operations on the piers. Through their power as union officials, they place their confederates in key positions on the docks, shake down steamship and stevedoring companies by threats of work stoppages, operate the lucrative public loading business, and carry on such activities as pilferage, loansharking and gambling.' (*pp.* 23–24)"

The Compact creates the Waterfront Commission as an agency of both states, with the authority to license or register workers, and, for good cause, to refuse licenses or registrations, and to regulate labor and hiring practices on the

waterfront. In order to further the elimination of waterfront evils, the Commission is empowered to investigate waterfront practices and other matters bearing on the objectives of the Compact, and to make recommendations to the two states for improvement of waterfront conditions and for effectuation of the purposes of the Compact. Article IV gives the Commission the power

"8. By its members and its properly designated officers, agents and employees, to administer oaths and issue subpoenas throughout both States to compel the attendance of witnesses and the giving of testimony and the production of other evidence;
\* \* \* \* \* \* \* \*
11. To make investigations, collect and compile information concerning waterfront practices generally within the port of New York district and upon all matters relating to the accomplishment of the objectives of this compact;
\* \* \* \* \* \* \* \*
13. To make annual and other reports to the Governors and Legislatures of both States containing recommendations for the improvement of the conditions of waterfront labor within the port of New York district, for the alleviation of the evils described in Article *I* and for the effectuation of the purposes of this compact." *N. J. S. A.* 32:23–10.

"Witness" is defined in the Compact as "any person whose testimony is desired in any investigation, interview or other proceeding conducted by the commission pursuant to the provisions of this act." *N. J. S. A.* 32:23–85. Failure to obey a subpoena of the Commission is made punishable by the Superior Court as for a contempt of that court. *N. J. S. A.* 32:23–62. And see *R. R.* 4:46–5(*c*).

█ The trial court had before it uncontradicted affidavits showing that the purpose of the Commission's investigation was to ascertain the facts concerning the issuance of local charters by the ILA to criminal elements. Clearly, the fact that known hoodlums and criminals may be exercising influence in the ILA is a matter within the Commission's statutory power "to make investigations, collect and compile information concerning waterfront practices generally." *N. J. S. A.* 32:23–10(11). It is also a matter which the

Commission may properly explore in the exercise of its duty "to make annual and other reports to the Governors and Legislatures of both States containing recommendations for the improvement of the conditions of waterfront labor within the port of New York district." *N. J. S. A.* 32:23–10(13). It is not significant that Local 1823 may not itself represent waterfront workers. It is conceivable that the issuance of ILA charters for such local unions to criminals may result in those persons' being placed in positions of influence and control in the general affairs of the ILA itself, which represents waterfront workers in the port of New York. As mentioned above, the existence of such criminal influence in the affairs of the ILA was one of the evils sought to be eliminated by the enactment of the Waterfront Commission Act.

A case very like the present one has recently been decided by the New York courts. *In re Barone's Application,* 18 *Misc. 2d* 1066, 187 *N. Y. S. 2d* 617 (*Sup. Ct.* 1959), affirmed 8 *A. D. 2d* 783, 187 *N. Y. S. 2d* 622 (1959), affirmed 7 *N. Y. 2d* 913, 197 *N. Y. S. 2d* 479, 165 *N. E. 2d* 427 (*Ct. App.* 1960). There the Waterfront Commission issued subpoenas *duces tecum* to officers of an ILA local. A motion was made to quash the subpoenas on the ground that the local represented waterfront workers who were not within the jurisdiction of the Commission. The declared purpose of the Commission's investigation, as here, was to ascertain how many members and officers of the local had criminal records, and whether they wielded any influence upon the ILA, the parent organization. The court refused to quash the subpoenas, holding that it was immaterial that they were addressed to persons not within the regulatory jurisdiction of the Commission, and stating that [18 *Misc. 2d* 1066, 187 *N. Y. S. 2d* 622]:

"A proper case for an administrative investigation is one which may be reasonably anticipated to lead the inquiring agency to a better performance of its delegated duties. A proper case for the issuance of a subpoena duces tecum by an agency or commission

'is ordinarily one where the books and papers called for have some relevancy and materiality to the matter under investigation.' *Carlisle v. Bennett, supra,* 268 *N. Y.,* at *page* 218, 197 *N. E.,* at *page* 222."

See also *Matter of Edge Ho Holding Corp.,* 256 *N. Y.* 374, 176 *N. E.* 537 (*Ct. App.* 1931), where it was held that the city commissioner of accounts investigating officials' accounts was not limited to an examination of city employees, but could compel by subpoena the attendance of persons who had dealings with city officials.

The above decisions follow the established rule that administrative agencies have the power to subpoena persons over whom they have no licensing or regulating jurisdiction, if those persons may have information relevant to a matter properly under investigation. *ICC v. Goodrich Transit Co.,* 224 *U. S.* 194, 32 *S. Ct.* 436, 56 *L. Ed.* 729 (1912); *Natural Gas Pipeline Co. of America v. Slattery,* 302 *U. S.* 300, 58 *S. Ct.* 199, 82 *L. Ed.* 276 (1937); *State ex rel. Railroad and Warehouse Commission v. Mees,* 235 *Minn.* 42, 49 *N. W.* 2d 386, 27 *A. L. R.* 2d 1197 (*Sup. Ct.* 1951); 1 *Davis, Administrative Law,* § 3.10 (1958).

The appellant argues that the conclusions as to the Commission's jurisdiction that the trial judge made are constitutionally permissible only after a "full hearing," with the right of cross-examination preserved to the appellant.

It is unclear what issues the appellant feels must be fully tried. If the Commission's information as to the appellant's activities and their connection with the waterfront must be tried for reliability or veracity, then the entire range of the Commission's investigation would be covered by a threshold inquiry into jurisdiction. If the issue to be tried is whether the Commission actually has the information it claims to have, then the whole preliminary investigative process would be subject to scrutiny in advance of any investigation. If either of these issues had to be fully tried in court on the question of the Commission's jurisdiction to proceed, the orderly discharge of the Commission's duty of investigation would be intolerably impaired.

■ The Commission's investigative function within its statutory jurisdiction is very like that of a grand jury. It must not act arbitrarily, or in excess of its jurisdiction, but the scope of its investigations is not to be limited by conjectural forecasts of their probable result. *Cf. Blair v. United States,* 250 *U. S.* 273, 39 *S. Ct.* 468, 63 *L. Ed.* 979 (1919). As Mr. Justice Cardozo said, speaking as Chief Judge of the New York Court of Appeals in *Matter of Edge Ho Holding Corp., supra,* of an attack on a city commissioner of accounts' jurisdiction to issue certain subpoenas:

"The powers devolved by the charter upon the Commissioner of Accounts are of great importance for the efficient administration of the huge machinery of government in the city of New York. They will be rendered to a large extent abortive if his subpoenas are to be quashed in advance of any hearing at the instance of unwilling witnesses upon forecasts of the testimony and nicely balanced arguments as to its probable importance. Very often the bearing of information is not susceptible of intelligent estimate until it is placed in its setting, a tile in the mosaic. Investigation will be paralyzed if arguments as to materiality or relevance, however appropriate at the hearing, are to be transferred upon a doubtful showing to the stage of a preliminary contest as to the obligation of the writ. Prophecy in such circumstances will step into the place that description and analysis may occupy more safely. Only where the futility of the process to uncover anything legitimate is inevitable or obvious must there be a halt upon the threshold." 256 *N. Y.,* at *page* 381, 176 *N. E.,* at *page* 539.

*Cf. Oklahoma Press Publishing Co. v. Walling,* 327 *U. S.* 186, 66 *S. Ct.* 494, 90 *L. Ed.* 614 (1946), and *Endicott Johnson Corp. v. Perkins,* 317 *U. S.* 501, 63 *S. Ct.* 339, 87 *L. Ed.* 424 (1943), which may be taken for the general proposition that the jurisdiction of an investigating agency to compel testimony in a particular matter is in the first instance to be determined by the agency. Only where the agency acts arbitrarily, or, in the words of Mr. Justice Cardozo, "where the futility of the process to uncover anything legitimate is inevitable or obvious" may the process be vacated. See also

*Endicott Johnson Corp. v. Perkins, supra,* 317 *U. S.,* at *page* 509, 63 *S. Ct.,* at *page* 343, 87 *L. Ed.,* at *page* 429.

 No doubt the interests of men to be free from officious intermeddling call for protection. But we feel that these interests may be adequately protected without a full judicial trial at the threshold of an investigation into the question whether it will uncover matter which should in the public interest be uncovered. The obligation of a subpoena cannot rest on a trial of the value of the testimony sought. It is enough that the proposed investigation be for a lawfully authorized purpose, and that the proposed witness be claimed to have information that might shed some helpful light.

The appellant's second argument is that he could not, as a constitutional matter, be held in contempt, since prior to his refusal to testify he was not sufficiently informed of the subject matter of the investigation to enable him to ascertain the pertinency of specific questions to be asked him. At the time of his appearance, the appellant was told by the Commission's counsel that he would be given that information after being sworn, but he refused to be sworn before it was given.

The appellant relies on two recent decisions of the United States Supreme Court, *Scull v. Com. of Virginia,* 359 *U. S.* 344, 79 *S. Ct.* 838, 3 *L. Ed. 2d* 865 (1959), and *Watkins v. United States,* 354 *U. S.* 178, 77 *S. Ct.* 1173, 1 *L. Ed. 2d* 1273 (1957). In *Scull v. Com. of Virginia,* the petitioner was convicted of criminal contempt for failure to obey an order of a Virginia court to answer a number of questions put to him by a legislative committee. He answered some of the committee's questions, but refused to answer others, after the committee denied his request that it inform him in what respect those particular questions were pertinent to the subject matter under inquiry. The Supreme Court held that, the committee having refused the information, Scull was deprived of "a fair opportunity, at the peril of contempt, to determine whether he was within his rights in refusing to answer and consequently his conviction must

fall under the procedural requirements of the Fourteenth Amendment. * * * To sustain his conviction for contempt under these circumstances would be to send him to jail for a crime he could not with reasonable certainty know he was committing." [359 *U. S.* 344, 79 *S. Ct.* 839, 843.]

In *Watkins v. United States,* the petitioner was convicted of criminal contempt of Congress for failure to make disclosures to a congressional investigating committee which he asserted were beyond the committee's authority to demand. As in the *Scull* case, the petitioner freely answered the committee's questions until they reached ground that he felt improper, and then he objected to answering specific questions until their pertinency was made clear. The Supreme Court held that the petitioner's conviction was invalid under the Due Process Clause of the Fifth Amendment. It stated that:

"Unless the subject matter has been made to appear with indisputable clarity, it is the duty of the investigative body, upon objection of the witness on grounds of pertinency, to state for the record the subject matter under inquiry at that time and the manner in which the propounded questions are pertinent thereto."

The court held that these requirements had not been met by the committee, and thus the petitioner could not be held criminally liable for an offense of whose criminality he was not made aware.

The differences between *Scull* and *Watkins* and the present case are clear. First, those were criminal contempts, the present case civil. We pass over the question, for a time when our decision may be required, whether that difference dictates a difference in result. But certainly the underlying rationale of *Scull* and *Watkins,* that a man is not criminally answerable for conduct he has no reason to believe unlawful, has no application here.

There are two differences upon which we prefer to base our decision. The first is that in *Scull* and *Watkins,* the witnesses were sworn, and testified before raising specific pertinency objections to specific questions, while here the

witness refused even to be sworn. There is no hint in the opinions in *Scull* and *Watkins* that a witness may refuse to be sworn, *i. e.,* refuse to take an action which in itself puts him in no danger of contempt, unless the pertinency of undisclosed questions to be asked him is revealed. And we perceive no reason why a witness should have the right to do so. The second difference is that here the appellant was fully apprised, prior to his being called, of the subject matter of the investigation. The appellant refused to be sworn on September 25, 1959. At least a week before, he was served with the affidavits partially quoted at the beginning of this opinion, which fully informed him of the subject matter. Appellant's counsel conceded on September 25 that the affidavits themselves apprised him of "what is generally the subject matter."

In these respects, the present case more closely resembles *Barenblatt v. United States,* 360 *U. S.* 109, 79 *S. Ct.* 1081, 3 *L. Ed. 2d* 1115 (1959). There, the petitioner was convicted of criminal contempt for his refusal to answer questions of a congressional committee relating to alleged Communist Party membership. After answering a few preliminary questions, the petitioner refused to proceed, objecting specifically to five questions on grounds set forth in a previously prepared statement that raised a number of objections to the committee's jurisdiction, but on the question of pertinency said only that if questioned about Communist Party membership he "might wish to * * * challenge the pertinency of the question to the investigation." The Supreme Court distinguished the *Watkins* case on two grounds, and upheld the conviction. The first ground was that Barenblatt raised no pertinency objection at the time the questions were asked him. The second was that the pertinency of the questions was made to appear "with indisputable clarity" before the questions were asked, by statements of the committee at the commencement of the investigation, at the beginning of the day's hearings, and while the petitioner was on the witness stand.

██ These cases make clear that a pertinency objection may be raised only in connection with a specific question or questions, and must be sustained only where the investigating body lacks jurisdiction or does not establish the pertinency of the question asked. The objection is not a means of avoiding the witness stand altogether. We are convinced that the appellant's constitutional rights were not violated when he was adjudged in civil contempt for his refusal to be sworn in response to the Commission's subpoena.

The appellant's final argument is that the subpoena was fatally defective because it failed to inform him of the nature of the Commission's investigation. To the extent that this argument may depend on the considerations discussed just above, it of course must be rejected on the basis of that discussion. But it may be an entirely different problem that is raised: May an administrative agency of limited jurisdiction, conducting an investigation, validly issue a subpoena that contains no recital of the matter under inquiry? Again, we must strip away possible side-issues. The question is not whether the agency may compel all testimony on the basis of such a subpoena. The pertinency objection is available. Neither is the question whether a contempt judgment may issue solely on the basis of such a subpoena, nor whether such a subpoena may itself withstand a motion to quash for lack of subject matter jurisdiction. In those cases, the agency must show its jurisdiction of the subject matter. The only question is whether the agency gains jurisdiction over the person who is served with a subpoena that contains no recital of the matter under inquiry.

██ The general investigative function of an administrative agency has been likened by the United States Supreme Court to that of a grand jury. *Oklahoma Press Publishing Co. v. Walling, supra; United States v. Morton Salt Co.,* 338 *U. S.* 632, 70 *S. Ct.* 357, 94 *L. Ed.* 401 (1950). The analogy is accurate. Both grand juries and administrative agencies may be given the power, within their jurisdictions, to conduct general inquiries into evils calling for

correction, and to report findings to the appropriate bodies and make recommendations for action. See *In re Camden County Grand Jury*, 10 *N. J.* 23 (1952), and 1 *Davis, Administrative Law*, § 3.02 (1958). The subpoena of a grand jury need not identify the subject matter of testimony sought or identify the cause to which it pertains. *In re application of Prosecutor of Hudson*, 79 *N. J. L.* 266 (*Sup. Ct.* 1910). *Cf. In re Haines*, 67 *N. J. L.* 442 (*Sup. Ct.* 1902). The same considerations dictating that grand jury subpoenas need not reveal the subject matter under inquiry also persuade us that an investigating agency need not forecast or limit by specification the scope of its examination merely to gain jurisdiction of a person whose testimony is relevant to a matter properly under investigation. The appellant's counsel, in the court below, conceded that the Commission had gained jurisdiction of his client's person, and focused his attack solely on the Commission's subject matter jurisdiction. We are satisfied that the Commission's subpoena was sufficient to compel the appellant's presence.

Affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—7.

*For reversal*—None.