**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**COLUMBIA BROADCASTING SYSTEM,**
**INC., Defendant-Appellant.**

**No. 73-2615.**

United States Court of Appeals,
Fifth Circuit.

July 11, 1974.

Talbot D'Alemberte, Miami, Fla., for defendant-appellant.

William H. Stafford, Jr., U. S. Atty., Pensacola, Fla., Guy L. Goodwin, Robert A. Dierker, U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before DYER, MORGAN and RONEY, Circuit Judges.

DYER, Circuit Judge:

Having determined in a companion case this day decided that the district court orders banning the publication of sketches of courtroom scenes are unconstitutional, United States v. Columbia Broadcasting System, Inc., 5 Cir., 497 F.2d 102, [No. 73–2602, July 11, 1974], we must now consider whether the contempt conviction of CBS for violating those orders should stand.

Because this appeal, in our opinion, turns on the question whether the district judge should have disqualified himself, and we think under the circumstances *sub judice* that he should have done so, we need not and do not reach the subsidiary issues raised by CBS.

The factual focus of this appeal centers on the events which culminated in the district court's issuance of a contempt citation to CBS for televising several sketches of various participants in the "Gainesville Eight" trial.[1] The sketching controversy began about 12:45 p. m. on June 20, 1973, when the district judge informed CBS News correspondent Duvall that no sketching would be allowed in the courtroom during proceedings related to the prosecution of Vietnam veterans accused of conspiring to disrupt the 1972 Republican National Convention. Duvall relayed this message to Aggie Whelan, a sketch artist covering the trial for CBS News, who had been in the courtroom observing the proceedings prior to the judge's order. Upon learning that she could not sketch in the courtroom itself, Whelan moved to the hall outside the courtroom and there began sketching from memory. Her artistic endeavors were noticed by a United States marshal who brought the matter to the attention of the district court. At approximately 3:45 p. m. the judge called Whelan and Duvall to his chambers, and at that time broadened his orders to prohibit the publication of any scenes of the "Gainesville Eight" trial, regardless of where the sketches were actually made.

Both orders issued on June 20 were delivered orally in the judge's chambers, and at neither time was a court reporter present. Consequently, the directives were not reduced to writing until June 27 when the court ordered CBS to show cause why it should not be held in contempt for its disobedience in telecasting the sketches on June 22. Since the original orders were verbal only, it was necessary to prove their content at the contempt trial by the testimony of those individuals who had witnessed the conversation between the judge and the journalists. The persons privy to the June 20 conversations and called as witnesses at the contempt trial were the judge's secretary, his law clerk, and a local newspaperman. In all significant respects the testimony of these three witnesses was completely harmonious. Since CBS introduced no evidence on its behalf, we must rely on the testimony of the prosecution's witnesses to learn what transpired at the June 20 meetings in chambers.

The second meeting, from which came the orders leading to this appeal, lasted some fifteen minutes, but the essence of the discussion can be succinctly summarized by quoting from the testimony of the local newspaperman:

> I recall Mr. Duvall asking Judge Arnow whether it would be permissible for Ms. Whelan to go back to her motel room and sit down and sketch from memory, taking no additional notes in the courtroom, and His Honor instructed Mr. Duvall again that absolutely no sketches were to be broadcast, regardless of where they were made.

The witnesses also agreed that the judge had remarked: "If you want to sketch anyone downtown or even walking into the court house, that is within your rights. I can't do anything about that."

---

1. For a broader account of the facts of this case, see our decision in the companion case.

The sketching restriction induced the president of CBS News on June 21 to telegram his network's protest to the district court. The next day, four of Whelan's sketches were televised on the CBS Morning News. On the same day the sketches were telecast, the following exchange between the judge and Duvall occurred in the presence of the judge's law clerk:

[T]he judge really emphasized this, he said, "I want to make this perfectly clear. We have no dispute of issues of fact or law here. You knew my order. You figured you had a right to publish [the sketches] and you went ahead and published [them] anyway, is that right?" And Mr. Duvall said "Yes," and nodded his head . . . .

The district court ordered CBS on June 27, 1973, to show cause why it should not be held in contempt. On July 3, CBS petitioned this Court for a writ of prohibition and a writ of mandamus. Both petitions were denied the same day. A notice of appeal and a "Motion to Suspend Injunction" were filed on July 6, and this Court on July 20 suspended the district court's orders until the merits of the appeal could be heard. CBS was tried for criminal contempt before the district court on July 7, was found guilty and fined $500.

We are faced with the unusual setting of a judge trying a case in which he was a principal actor in the factual issues to be determined. Essential to the proof of the prosecution's case were acts committed by the judge himself, i. e. the verbal, unrecorded orders. The judge had to determine whether what he said was said was really said. He obviously could not be a witness and a judge in the same proceeding. To prove what the judge must have thought he already knew, his secretary, his law clerk and a local reporter were called as prosecution witnesses.

■ A criminal contempt action for violation of a court order is somewhat different than other criminal proceed-

ings. The judge whose orders were allegedly violated has a keener interest in the outcome, especially if those orders are outside of the judicial mainstream. Although contempt proceedings may be initiated by a judge on his own motion, the prosecution, taken over by Government attorneys, nevertheless must prove a charge of criminal contempt beyond a reasonable doubt. Hood v. United States, 5 Cir. 1964, 326 F.2d 33; Yates v. United States, 10 Cir. 1963, 316 F.2d 718; James v. United States, 8 Cir. 1960, 275 F.2d 332; Parker v. United States, 1 Cir. 1946, 153 F.2d 66; Western Fruit Growers v. Gotfried, 9 Cir. 1943, 136 F.2d 98. Thus, although the court's verbal orders in this contempt proceeding must meet the test of reasonable certainty, Scull v. Virginia, 1959, 359 U.S. 344, 79 S.Ct. 838, 3 L.Ed.2d 865, a trier of fact must find no reasonable doubt as to their meeting that test. This is unlike civil contempt which could be proved by preponderance of the evidence. A. H. Robins Co. v. Fadely, 5 Cir. 1962, 299 F.2d 557.

The recondite niceties of contempt law coupled with the strange milieu of a judge passing on the clarity of his own orders, which had to be substantiated largely by his own legal staff, should make us particularly sensitive to the demands of justice, and more particularly, to the appearance of justice. The guarantee to the defendant of a totally fair and impartial tribunal, and the protection of the integrity and dignity of the judicial process from any hint or appearance of bias is the palladium of our judicial system. Cf. Mayberry v. Pennsylvania, 1971, 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532; Grizzell v. Wainwright, 5 Cir. 1973, 481 F.2d 405.

■■ Although Mayberry and Grizzell are not directly in point, the underlying principles they establish have a parallel application here and require a trial by another judge, especially in view of the fact that no exigent circumstances militate otherwise. This result can be reached without deciding any constitutional issue. This Court has the

**110**

authority to disallow such a practice under its supervisory powers. The trial judge in this case may well have had the unique ability to be an impartial judge in the circumstances, but regardless of that fact, such a trial does little to protect the judicial process from any possible suspicion of bias.

The conviction for contempt is reversed and the cause is remanded for a new trial before a different judge. We leave open for consideration by the court below all other issues presented on this appeal, and the advisability of pursuing the contempt action in view of our determination that the verbal orders issued are unconstitutional. *Cf.* United States v. Schrimsher, 5 Cir. 1974, 493 F.2d 842 [1974]; United States v. Dickinson, 5 Cir. 1972, 465 F.2d 496; State v. Payne, Cir.Ct.1974, 40 Fla.Supp. ——.

Reversed and remanded.