**Bob TATE and Jerry Higgs, Plaintiffs-Appellees,**

v.

**Lola AKERS, Dorothy Dietz, Dick Foster, Roger Gonzales, Patsy McGinley, Frank H. Moore, Norman E. "Skip" Roberts, and Richard W. Weeks, Members of the City Council of the City of Laramie, Wyoming, Ted C. Gertsch, Member of the City Council of the City of Laramie, Wyoming and Mayor of the City of Laramie, Wyoming, and Ted Kersting, Chief of Police of the City of Laramie, Wyoming, Defendants-Appellants.**

No. 76–1418.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted May 18, 1977.

Decided Nov. 23, 1977.

Hugh B. McFadden, Jr., Laramie, Wyo. (Corthell, King, McFadden, Nicholas & Prehoda, Laramie, Wyo., Warren L. Johns, Walter E. Carson, Johns & Carson, Washington, D. C., and Boardman Noland, Takoma Park, Md., on the brief), for plaintiffs-appellees.

Thomas S. Smith, Laramie, Wyo. (Smith, Stanfield & Scott, Laramie, Wyo., on the brief), for defendants-appellants.

Before McWILLIAMS and BARRETT, Circuit Judges, and BOHANON, Senior District Judge.*

McWILLIAMS, Circuit Judge.

The precise question in this appeal is whether a Seventh Day Adventist "literature evangelist," sometimes referred to as a "colporteur," is a "solicitor," "peddler," "hawker," or "itinerant merchant," as those

---

* Of the United States District Court for the Western District of Oklahoma, sitting by designation.

terms are used in the City of Laramie's version of the so-called Green River Ordinance. The trial court, after trial of the matter and after having heard testimony as to the nature of a colporteur's work, found, and concluded, that a colporteur was neither a solicitor, a peddler, a hawker, nor an itinerant merchant, and accordingly held that the Laramie ordinance did not apply to colporteurs. The trial court's memorandum opinion appears as *Tate v. Akers*, 409 F.Supp. 978 (D.Wyo.1976). Our study of the matter convinces us that the trial court's disposition of the matter finds support in the record, and we therefore affirm.

The ordinance with which we are here concerned, Laramie, Wyo. City Code § 28–3, provides as follows:

> *The practice* of going in and upon private residences, in the city, *by solicitors, peddlers, hawkers, itinerant merchants,* not having been requested or invited to do so by the owner or occupant of such private residences for the purpose of soliciting orders for the sale of goods, wares, and merchandise, or for the purpose of disposing of or peddling or hawking the same, is hereby declared to be unlawful and a nuisance. The chief of police and police force of the city shall suppress the same and abate any such nuisance. (Emphasis added.)

The record before us does not disclose the date when the foregoing ordinance was enacted. The record does disclose that in 1974 an amendment to exempt bona fide religious organizations from the ordinance was defeated by the City Council for Laramie, Wyoming. Thereafter, the Mayor and City Council of Laramie announced their intention to enforce the ordinance against colporteurs of the Seventh Day Adventist Church and others. Apparently the ordinance had not been so enforced prior thereto. In any event, it was in this general setting that Bob Tate and Jerry Higgs, both members of the Seventh Day Adventist Church and each responsible for carrying on, and supervising others carrying on, "a campaign of literature evangelism in Laramie, Wyoming," brought a class action against the Mayor, the members of the City Council, and the Chief of Police of Laramie, Wyoming. Pursuant to 28 U.S.C. §§ 2201 and 2202, the plaintiffs sought a declaratory judgment that the aforementioned ordinance by its own terms was inapplicable to them, and, alternatively, that if the ordinance were found to be applicable to them, a declaration that the ordinance is unconstitutional under the First and Fourteenth Amendments to the United States Constitution. Jurisdiction was based on 28 U.S.C. § 1343, the action being one in equity authorized by 42 U.S.C. § 1983.

The defendants' position was that the ordinance in question was applicable to the plaintiffs and that such was a constitutional exercise of police power by the City of Laramie.

Trial was to the court, and the plaintiffs called two witnesses who testified as to the general nature of the Seventh Day Adventist religion, and more particularly as to the nature of a colporteur's religious work. The defendants called some three witnesses, the testimony of two relating to the unsuccessful attempt in 1974 to amend the ordinance so as to exempt bona fide religious organizations, and the intent of Laramie officials to enforce the ordinance against the plaintiffs. Defendants' third witness testified concerning the Seventh Day Adventist Church. Upon the conclusion of the trial, the judge held that the ordinance did not apply to the plaintiffs, and accordingly declined to reach the question as to whether the ordinance, if it did apply to the plaintiffs, was constitutional. By its judgment, the trial court enjoined the defendants from enforcing the ordinance against the plaintiffs. The Mayor, City Council, and the Chief of Police now appeal from that judgment.

■ There is nothing in the record to indicate the legislative intent of the City Council which enacted the ordinance. The fact that, in 1974, an amendment to exempt bona fide religious organizations from the ordinance was defeated is no evidence of the legislative intent behind the original enactment of the ordinance which presuma-

bly occurred prior to 1974. Thus, in determining the applicability of the ordinance to the plaintiffs, we, like the trial court, must look to the ordinance itself, and the language thereof.

The ordinance provides, in effect, that the acts of uninvited "solicitors, peddlers, hawkers, [and] itinerant merchants" in going to private residences for the purpose of soliciting orders or selling "goods, wares, and merchandise" constitute a nuisance and should be abated. Is a colporteur of the Seventh Day Adventist Church a solicitor, peddler, hawker, or itinerant merchant? Such determination depends on the nature of a colporteur's activities.

The trial judge in his memorandum opinion made detailed findings concerning the Seventh Day Adventist Church and its use of colporteurs to spread its version of the gospel. Such findings will be only summarized here. Plaintiffs are members of the Seventh Day Adventist Church and they propose to engage in a campaign of literature evangelism in the City of Laramie, Wyoming. The Seventh Day Adventists comprise a religious denomination with more than 2,500,000 members. Two basic tenets of the religion are that the seventh day of the week, namely, Saturday, is the Sabbath and that there will be a second coming of Christ. Literature evangelism is a formal program of the Church and has been relied on for more than a hundred years as a primary means of spreading their gospel and gaining converts. A literature evangelist, or colporteur, is a credentialed representative of the Church and is considered to be engaged in a form of ministry. Prior to being selected as a colporteur, the applicant is subjected to rigorous investigation to determine that he is well-trained in church doctrine and that he is otherwise suited for this calling.

As concerns a colporteur's method of operation, the trial court found such to be as follows:

The literature evangelist goes from door-to-door attempting to engage residents in conversations about contemporary problems and proposing to offer a religious solution to them. If the householder shows no interest or does not invite them into the house, the literature evangelist politely leaves. If the householder invites the literature evangelist into his home, the evangelist discusses these world problems, offers his religious solution to them, and in the course of it, may offer to sell the individual any one or more of a series of publications produced by the church.

The publications which the literature evangelist offers for sale are magazines and handsomely illustrated, hard-bound books. These magazines and sets of books range in price from approximately $8 for the magazine subscriptions to in excess of $125.00 for one of the many sets of hard-bound books. Their subject matter ranges from purely religious matters such as stories from the Bible, designed for both children and adults, to treatises on health and home medicine. If the individual is not interested in purchasing any of the sets offered for sale, the literature evangelist offers to pray with the individual or the family and also offers to leave with them at no cost a 32-lesson home-study Bible course. The evangelist also endeavors to make an appointment for a return visit in order to continue the ministry which has begun with this first visit. 409 F.Supp. at 979–80.

It should be noted that another tenet or belief of the Seventh Day Adventists is that the physical body is itself a temple for the Holy Spirit, and hence the Church, by appropriate literature and otherwise, encourages good health and physical well being. This particular tenet accounts for the fact that some of the material sold by colporteurs relates to health and home medicine.

The colporteurs are given a commission on literature sold by them, although such does not make the colporteur fully self-supporting. The Church gives them additional assistance in the form of subsidies for living

quarters, automobile expense, paid vacation, medical expense, and the like.

 The defendants state that the only aspect of plaintiffs' conduct which they found objectionable and in violation of the ordinance is the fact that the plaintiffs propose to sell religious oriented literature from house-to-house. The defendants concede that if plaintiffs only went from door-to-door spreading their version of the gospel, and in connection therewith distributing church literature free of charge, there would be no violation of the ordinance. In such circumstance, the plaintiffs would be but "ministers." But, say the defendants, when in connection with their ministry the plaintiffs attempt to sell church literature, the "ministry" ceases to be a "ministry," and the minister is transformed into a "solicitor," "peddler," "hawker," or "itinerant merchant," and, as such, is within the ambit of the ordinance. With such reasoning we are not in accord. We agree with the trial court that the dominant and primary mission of the colporteur is to spread the gospel, and the sale of church literature is incidental thereto and does not convert a minister into a peddler.

A case quite similar to the present one is *Donley v. City of Colorado Springs,* 40 F.Supp. 15 (D.Colo.1941). There, the City of Colorado Springs enacted an ordinance which prohibited "solicitors, peddlers, hawkers, itinerant merchants and transient vendors of merchandise" from entering residences without invitation to solicit orders for, or sell, goods, wares and merchandise. The local Colorado Springs police sought to enforce the ordinance against members of Jehovah's Witnesses, who went door-to-door spreading their version of the gospel and offering for sale various booklets on Bible subjects at five cents a copy. In granting injunctive relief, the trial court held, *inter alia,* that ministers of a duly recognized religious sect, who sincerely exercise their faith by preaching the gospel and offering to take subscriptions for religious publications from door-to-door, were not solicitors, peddlers, hawkers, itinerant merchants or transient vendors within the meaning of

those terms as used in the ordinance. In a similar vein, in *City of Shreveport v. Teague,* 200 La. 679, 8 So.2d 640 (1942), the Supreme Court of Louisiana held that an ordained member of the Jehovah's Witnesses, going door-to-door as an itinerant preacher and in connection therewith distributing religious literature and attempting to obtain a contribution therefor, was neither a solicitor, peddler, hawker, itinerant merchant or transient vendor of merchandise.

Having concluded that the trial court, on the basis of the record before it, did not err in holding that the ordinance in question was inapplicable to the plaintiffs, we, like the trial court, do not here reach the constitutional issue which would be raised if the ordinance did include a person performing as the plaintiffs proposed to do in the City of Laramie. We do not agree with the trial court's comment in this regard that if the ordinance were reenacted so as to include persons situated as are these plaintiffs, such would pose "serious constitutional objection."

Judgment affirmed.

BARRETT, Circuit Judge, dissenting:

I respectfully dissent. In my opinion the majority has, in effect, employed that which I would designate as the "good purpose doctrine" in order to render the uninvited house-to-house, door-to-door solicitations (for sale) by evangelists of the Seventh Day Adventist Church of certain religious periodicals, books and encyclopediäs published by the Church beyond the plain and unambiguous proscription of the so-called "Green River Ordinance." This has been accomplished by focusing on the *purpose* (raising funds in order to spread the Gospel) rather than the true condemned *activity* (sale for profit in the pure commercial sense of the word).

The "Green River Ordinance" here invoked is completely neutral and impartial: It prohibits "the practice" by "solicitors,

peddlers, hawkers, itinerant merchants" of going in and upon private residences in the City of Laramie to solicit orders "for the sale of goods, wares and merchandise" without a prior request or invitation by the owner or occupant. Thus, the "practice" is the activity, i. e., solicitation for sale. The ordinance clearly, unambiguously and unqualifiedly prohibits the *activity* pursued in this case, regardless by whom it may be pursued and regardless of the *purpose* to be served. Just as no tax may be levied to support any religious activities or institutions violative of the Establishment Clause of the First Amendment [*Everson v. Board of Educations,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947)], so, too, the courts must be alert to prohibit . . . "prophylactic contacts . . . [which] involve excessive . . . entanglement between state and church." *Lemon v. Kurtzman,* 403 U.S. 602, 619, 91 S.Ct. 2105, 2114, 29 L.Ed.2d 745 (1971). I believe that the judicially created exception grafted upon the ordinance in this case by the majority, i. e., that which I have previously referred to in effect as the "good purpose doctrine" is in conflict with the command set forth in *Scull v. Virginia,* 359 U.S. 344, 79 S.Ct. 838, 3 L.Ed.2d 865 (1959), mandating clarity in any penal statute or court order. In my judgment the ordinance is clear and unambiguous. In *Reynolds v. United States,* 98 U.S. 145, 25 L.Ed. 244 (1878), the Supreme Court held that to permit a defendant to exercise *conduct* by reliance on religious belief "would be to make the professed doctrines of religious belief superior to the law of the land, and, in effect, to permit every citizen to become a law into himself. Government could exist only in name under such circumstances."

In my judgment one point is beyond dispute: The United States Supreme Court has upheld the police power of the state to protect its citizens from the nuisance of house-to-house solicitations for sale of any goods without prior request or invitation of the owner or occupant. *See: Hynes v. Mayor and Council of the Borough of Ora-*dell, et al., 425 U.S. 610, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1976); *Breard v. City of Alexandria,* 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951), 35 A.L.R.2d 335, Anno., 355–380; 77 A.L.R.2d 1216, Anno.; 60 Am. Jur.2d, § 58. For analogy see 14 A.L.R.3d 896, Anno. entitled "Peddling on Streets." The crux of these authorities is simply that ordinances such as the Green River Ordinance are constitutionally valid.

The problem presented here is, in my view, analogous to that presented to this court in *Christian Echoes National Ministry, Inc. v. United States,* 470 F.2d 849 (10th Cir. 1972), *cert. denied,* 414 U.S. 864, 94 S.Ct. 41, 38 L.Ed.2d 84 (1973). There, Christian Echoes, a non-profit religious corporation, believed, as a matter of faith, that the solutions to the world's problems, economic, political and spiritual, required a rejection of atheistic world forces and a battle against communism, socialism and political liberalism, all of which were considered by the organization to be arch enemies of the Christian faith. A provision of the Internal Revenue Code disqualified a religious organization engaged in substantial activity aimed at influencing legislation from a particular tax exempt status. We held that Christian Echoes had been so engaged and that it was not entitled to the subject tax exempt status so long as it is substantially involved in the condemned activities. In putting down the Christian Echoes contention that denial of its tax exempt status under the Code violated its guaranteed right to free exercise of religion under the First Amendment we said, *inter alia:*

> . . . Such conclusion is tantamount to the proposition that the First Amendment right of free exercise of religion, ipso facto, assures no restraints, no limitations, and, in effect, protects those exercising the right to do so unfettered. . . . [here] . . . The free exercise clause of the First Amendment is restrained only to the extent of denying tax exempt status and then only in keeping with an overwhelming and compel-

ling Governmental interest: That of guarantying that the wall separating church and state remain high and firm. We reject [the First Amendment contention] . . . just as the United States Supreme Court [has] put down attacks against the enforcement of the provisions of the "Hatch Act" predicated on First Amendment free speech and assembly rights, . . . First Amendment rights are not absolutes and . . . courts must balance First Amendment freedoms against . . . enactment . . . to protect society . . . 470 F.2d at pp. 856, 857.

I would reverse.