CBS, INC., a corporation, Plaintiff,

v.

Marvin S. LIEBERMAN, Chairman of the Illinois Commerce Commission, Charles E. Freeman, C. Burtin Nelson, Alfred H. Reichman, and Helen D. Schmid, Members of the Illinois Commerce Commission, Defendants.

No. 76 C 2928.

United States District Court,
N. D. Illinois, E. D.

Sept. 2, 1976.

## MEMORANDUM DECISION

MARSHALL, District Judge.

This action by plaintiff CBS, Inc. against defendants Marvin S. Lieberman, et al., the duly appointed members of the Illinois Commerce Commission, presents the question—Do those who disseminate news by television have a First Amendment right to film or videotape in an unobtrusive, non-disruptive manner the testimony of non-objecting witnesses and the arguments of non-objecting counsel at a non-adjudicatory public hearing of a governmental agency? Asserting the affirmative, plaintiff alleges that its First Amendment right is infringed by the unwritten "policy of the Commission to prohibit filming, photographing and tape recording during [Commission] hearings." Defendant Lieberman's letter of July 29, 1976 to plaintiff's news director Feldman; Exhibit A to plaintiff's complaint. Jurisdiction is here under 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3). Plaintiff's motion for a preliminary injunction is ready for decision. This memorandum constitutes our findings of fact, conclusions of law and reasons for our decision under Rules 52(a) and 65(d), *Fed.R.Civ.P.*

The Illinois Commerce Commission is the agency of the State of Illinois which regulates public utilities in Illinois. Under the statute creating the Commission, its hearings must be conducted publicly. *Ill.Rev. Stat.* ch. 111⅔, § 64 (1975). See also, the Illinois Open Meetings Law, *Ill.Rev.Stat.* ch. 102, §§ 41–42 (1975). The Commission's Rule XI(a) provides, "All hearings conducted in any proceeding shall be open to the public. . . ." While the Rules do not prohibit or regulate the filming, audiotaping or videotaping of Commission hearings, there is a statute of general application in Illinois which provides:

"No witness shall be compelled to testify in any proceeding conducted by a court, commission, administrative agency or other tribunal in this State, if any portion of his testimony is to be broadcast or televised or if motion pictures are to be taken of him while he is testifying." *Ill.Rev.Stat.* ch. 51, § 57 (1975).

Newton N. Minow, Thomas H. Morsch, Merle L. Royce, II, Dale R. Crider, Sidley & Austin, Chicago, Ill., Ralph E. Goldberg, Howard F. Jaeckel, CBS, Inc., New York City, for plaintiff.

Michael H. King, Donald Page Moore, Antonow & Fink, Chicago, Ill., for defendants.

Process to compel the attendance of witnesses is available to the Commission, *Ill. Rev.Stat.* ch. 111⅔, § 66 (1975), but it does not have the power to punish for contempt. Its process must be judicially enforced (*id.*), and disruption or interference with its proceedings can be dealt with only through criminal prosecution. *Id.* § 81.

Plaintiff CBS, a corporation organized under the laws of New York, is engaged in the collection, processing and reporting of news and information to the public through the media of radio and television. It owns and operates WBBM–TV in Chicago which is also engaged in the collection, processing and reporting of news and information to the public.

Testimony at the hearing on plaintiff's pending motion showed that during the period 1972 through early 1976, a television reporter for WBBM–TV was permitted to film or videotape evidentiary hearings held before the Commission or one of its hearing examiners on three or four occasions. Defendants do not concede the truth of that testimony. The facts in respect to it were not pleaded and defendant's counsel professed that it took them by surprise. Nevertheless, it presently stands uncontradicted.

On July 7, 1976 Carol Saynisch, a reporter for WBBM–TV and a television film crew from the station were assigned to cover an evidentiary hearing convened by the Commission dealing with the regulation of tow truck operators. Reporters and film crews from other Chicago television stations, radio stations and newspapers were also present. The Commission's hearing examiner permitted the television cameras to be set up for prehearing "cover shots" and interviews with witnesses and attorneys who were willing to be interviewed. Upon the opening of the evidentiary hearing, however, the hearing examiner ordered television filming stopped upon the ground that it was the Commission's practice not to permit television filming or recording of its hearings.

The television reporters, including Ms. Saynisch, refused to comply with the order, asserting that they had the right to gather information for later television broadcast using the technology available to them. The hearing was then suspended.

On July 7 camera filming was being used by plaintiff's reporter and two or three bright but diffused tripod lamps were turned on. Recording microphones were placed in front of the hearing examiner and the witness stand. None of the participants in the hearing other than the hearing examiner objected to the filming or recording.

On July 13, 1976 Ms. Saynisch and a film crew were assigned to cover public hearings before the Commission regarding proposed increases in natural gas rates, at which representatives of the Peoples Gas Company were scheduled to participate. Other Chicago television stations, radio and newspaper reporters were again present. In addition, the Northwest Community Organization, a public interest group and a party to the proceedings, brought a videotape camera to record the hearing for later viewing by its members.

As at the prior hearing, the hearing examiner allowed filming of the prehearing activities, "cover shots" and interviews of those willing to be interviewed, but ordered all television and audio recording devices turned off and removed from the room when the evidentiary hearing began. When members of the radio and television media declined to remove their equipment, the hearing was recessed. During the recess an official of Peoples Gas informed Ms. Saynisch that it had no objection to the hearing being televised.

Following the recess the hearing examiner announced that all cameras and audio equipment had to be removed or the hearing would be cancelled. He stated it was the Commission's position that it was a "quasi-judicial body" operating under the same rules as courts. After the second order, all television camera crews and the persons operating the equipment of the Northwest Community Organization left the hearing room.

Thereafter, Ms. Saynisch interviewed defendant Lieberman, Chairman of the Com-

mission, concerning the "policy" of excluding television cameras. Mr. Lieberman stated that the Commission was a "quasi-judicial body" and that the Commission was concerned that the presence of television equipment might disrupt the proceeding and that witnesses might object to having their testimony televised.

On July 14, 1976, Ms. Saynisch was again assigned together with a videotape crew to cover Commission hearings concerning the prohibition of smoking in suburban transit stations. As at the previous hearings, Ms. Saynisch and her crew were allowed to take "cover shots" and interview those willing to be interviewed prior to the hearing, but once the proceedings began, they were told to remove their videotape equipment. The WBBM–TV cameraman turned off his lights. He continued to videotape under natural light, i. e., the light present in the room without the addition of camera lights. The proceedings started and were being videotaped when the hearing examiner inquired whether the camera was still running. When informed that it was, the hearing examiner stated that while she was not aware that it was operating (i. e., it was not interfering with her discharge of her duties), nevertheless, it had to stop. On Ms. Saynisch's refusal, the hearing was recessed. At the end of the recess when WBBM–TV persisted in its refusal to remove its cameras, the hearing was adjourned. None of the potential witnesses objected to televised coverage of their testimony.

On July 20, 1976 defendant Lieberman wrote to Mr. Jay Feldman, the news director of WBBM–TV:

"The Commission recognizes the right of all media to be present at hearings, to take notes, or to use the Commission's official stenographic transcriptions of the hearings. The Commission does not prevent the gathering of news by the media. The media is free to interview any witness or counsel who wishes to be interviewed before or after the hearing. We have always made space available for this type of activity outside the hearing room.

"The Commission, a quasi-judicial body, conducts hearings under the same rules of order as courts. It is the policy of the Commission to prohibit filming, photographing and tape recording during hearings.

.     .     .     .     .

"The Commission intends to abide by its policy regarding lights, cameras and tape recorders at future evidentiary hearings.

.     .     .     .     .

"It is our hope that anyone wishing to dispute the Commission's policy will seek a resolution of the dispute in an appropriate legal forum rather than engaging in conduct that is disruptive and counterproductive."

Exhibit A to plaintiff's complaint.

This action followed.

Plaintiff's instant motion for preliminary injunctive relief is addressed to our discretion which, in turn, is to be guided by certain well established criteria. Plaintiff must show a likelihood of success on the merits; irreparable harm to itself if the relief is not granted and the lack thereof to defendants if it is; and that the public interest will not suffer adversely if the relief is granted. We consider first, because we deem it determinative of our ruling on the pending motion, the likelihood of success on the merits.

Plaintiff contends that the Commission's policy constitutes an impermissible prior restraint on plaintiff's First Amendment right to publish news concerning the activities of the Commission. But plaintiff has not been restrained from disseminating news or comment upon the proceedings before the Commission. Cf. Nebraska Press Association v. Stuart, 427 U.S. 593, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); New York Times v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); Chicago Council of Lawyers v. Bauer, 522 F.2d 242 (7th Cir. 1975), cert. den. 427 U.S. 912, 96 S.Ct. 3201, 49 L.Ed.2d 1204. Rather, what is involved here is a limitation upon the

manner in which plaintiff may gather, record or memorialize information for television dissemination. The question is whether defendants' limitation is constitutionally permissible.

The open meeting statutes and Rule under which the Commission operates are legislative implementations of the right of the citizen in a free society to observe the workings of government. If the public is admitted, reporters from all media, as members and representatives of the public, must also be admitted. Defendants do not contend otherwise.

Defendants also concede a First Amendment right in those attending a hearing to record or memorialize that which they see and hear by paper and pencil. No authority to the contrary has come to our attention.

But what of electronic recording and filming devices? Do they enjoy similar First Amendment protection? CBS asserts that they do in the context of a non-adjudicatory hearing absent a showing of actual disruption or interference which, on the record to date, has not been made. Defendants, on the other hand, basing their arguments largely on *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965), assert the contrary.

In light of the extent to which television has moved into the field of news reporting,[1] one would expect an abundance of authority on the question. But that which exists is scant. Only one court has held that a public tribunal cannot prohibit filming or taping of its proceedings.

In *Estes,* the question was whether the defendant in a state court criminal prosecution had been deprived of his liberty without due process of law in violation of the Fourteenth Amendment by reason of the disruptive atmosphere created by the taping and filming of portions of his trial for live and delayed television broadcast. The state trial judge had permitted the activity over defendant's objection. The five-member majority of the Court, writing three separate opinions, concluded that the record demonstrated a sufficient intrusion into the deliberative process of the trial so as to constitute an infringement of the defendant's due process rights. Mr. Justice Clark, writing the opinion of the Court, concluded that whatever First Amendment rights were involved were subordinate to the defendant's due process rights. Chief Justice Warren, writing for himself and Justices Douglas and Goldberg, concluded that there was no First Amendment right to televise a criminal trial. Justice Harlan, writing separately in concurrence, also concluded that First Amendment rights were not involved. The dissenters, Justices Black, Brennan, Stewart and White, in opinions authored by Justices Stewart and White, avoided the First Amendment question because of their conclusion that the television activities at the trial were unobtrusive, did not disrupt the proceedings, and did not detract from the adjudicative process in sufficient degree to warrant the conclusion that the defendant's due process rights had been violated.

To the extent that the members of the Court addressed the First Amendment question, it was resolved against the media. But the *Estes* opinions were laced with apprehensions about the effect of television upon the participants in the case. Thus, Mr. Justice Clark added the caveat, "when the advances of these arts permit reporting . . . by television without their present hazards to a fair trial, we will have another case." 381 U.S. at 540, 85 S.Ct. at 1631. And Mr. Justice Stewart cautioned against any *per se* due process rule which "in the light of future technology, might serve to stifle or abridge true First Amendment rights." 381 U.S. at 604, 85 S.Ct. at 1671.

*Dorfman v. Meiszner,* 430 F.2d 558 (7th Cir. 1970), was concerned with a rule of this court which prohibited the taking of photographs in the courtrooms of this building or their "environs." The rule defined environs in an overly broad manner and the court of

---

1. Plaintiff's Exh. 1, a survey of public attitudes toward television and other mass media reveals that in a field of four—television, radio, newspapers and magazines—Americans receive at least 50% of their news from television.

appeals held it invalid in that respect. Nonetheless, the court held "that the district court may, by rule, exclude photographing and broadcasting from those areas of the courthouse which would lead to disruption or distraction of judicial proceedings . . . ." 430 F.2d at 561. And see Rule 53, *Fed.R.Crim.P.*, which prohibits the taking of photographs or broadcasting of trials in federal courts.

*United States v. Columbia Broadcasting System, Inc.*, 497 F.2d 107 (5th Cir. 1974), did not involve the introduction of television filming and recording equipment in the courtroom. Rather, it dealt with the question whether paper and pencil sketching can be prohibited in the courtroom. The court concluded that it could not, consistent with the First Amendment.

In *1590 Broadcasting Corporation v. Public Utilities Commission*, 306 A.2d 49 (1973), the Supreme Court of New Hampshire concluded that the Public Utilities Commission of that state could prohibit the broadcast of a tape recording of a Commission hearing which was made in the first instance to enable a party to participate in an informed manner in the proceedings, *i. e.*, the recording was made in lieu of a stenographic transcript. The New Hampshire court gave little attention to the constitutional issue which CBS here presents, merely observing in passing that the Commission "had the right to prohibit the private recording of its proceedings altogether . . . ." 306 A.2d at 51.

The Maryland Supreme Court has upheld a rule of the Maryland Legislature prohibiting tape recordings of legislative sessions. *Sigma Delta Chi v. Speaker*, 270 Md. 1, 310 A.2d 156 (1973).

New York trial courts have, on two occasions, sustained prohibitions against mechanical recording devices and television cameras at public hearings. In *Davidson v. Common Council*, 40 Misc. 1053, 244 N.Y. S.2d 385 (N.Y.Sup.Ct.1963), the court held that a legislative body has the power to forbid the use of a mechanical recording device if "in the judgment of the legislative body, the recording distracts from the true deliberative process." In *Educational Broadcasting System, Inc. v. Ronan*, 68 Misc.2d 776, 328 N.Y.S.2d 107 (N.Y.Sup.Ct. 1972), the court sustained the Metropolitan Transit Authority's policy of barring television cameras from its hearings.

The only authority which has been brought to our attention which explicitly recognizes a right in the media to mechanically or electronically record the proceedings of a public body is *Nevens v. City of Chino*, 233 Cal.App.2d 775, 44 Cal.Rptr. 50 (5th Dist. 1965), where the court concluded in an opinion reticent on First Amendment principles, that the rule constituted "an unreasonable deprivation of the means to make an accurate record of what transpires in a public meeting . . . ."

Plaintiff maintains that modern film and videotape equipment is unobtrusive and not disruptive. It further contends that the proceedings which it seeks to film or videotape are not adjudicatory but are informational in nature and concerned with issues of broad public interest: the regulation of tow trucks, gas rates and the regulation of smoking in public places. These circumstances, it asserts, distinguish its First Amendment claim from virtually all of the decided precedents.

We recognize that today's television filming equipment is a far cry from that which was employed in *Estes*. As a result of contemporary technology, filming can be done with no additional lights. The videotape cameras are not much larger than a shoe box. They can be operated on standard 120 volt current. Indeed, they can be operated by a battery pack carried by the cameraman. Perhaps the day has arrived when equipment of this nature should be likened to pencil and paper and afforded the same protection as that extended to courtroom sketching. *United States v. Columbia Broadcasting System, Inc., supra.*

But the existent precedent is clearly against plaintiff and the potential consequences of the relief which plaintiff seeks are so profound as to dictate against adjudicating the issue in plaintiff's favor at the conclusion of an abbreviated hearing on a motion for preliminary injunction.

More is involved than the public's right to know, or the right of those who disseminate news to gather it or the need of a public hearing to be free from disruption occasioned by the unwieldy cameras and kleig light of the past. The sensitivities of the participants; the desires of many not to become public spectacles on a mass basis; the public interest that even non-adjudicatory hearings such as those conducted by the Commission not become a stage or platform for the willing witness or counsel who responds enthusiastically to time on the camera, all deserve full ventilation and thoughtful deliberation.

Illinois protects certain of these interests by its statute which prohibits compelling a person to testify before radio, television or motion picture equipment. *Ill.Rev.Stat.* ch. 51, § 57 (1975). And it has been held, in the absence of such a statute, that a person who refuses to testify under process before a television camera is not guilty of contempt. *United States v. Kleinman,* 107 F.Supp. 407 (D.D.C.1952).

Plaintiff's response to this is that none of the participants in the hearings it sought to film or tape objected, save the hearing examiner. But the preliminary answer to that is twofold: first, the Commission should not be obliged to conduct, regulate or schedule its hearings around the participants' consent to be filmed or lack thereof. Second, it does not prohibit pre and posthearing television interviews of those participants who are willing to be interviewed.

■ Nor can the potential threat of television to the dignity and decorum of the Commission's hearings be minimized. In *Estes, supra,* certain of the members of the Court took judicial notice of the ebullience which television cameras can generate in hearing participants. 381 U.S. at 569, 85 S.Ct. 1628. Those conclusions have not been adequately challenged here. And while we can take judicial notice of recent televised hearings which have been conducted with the greatest of decorum, we can also judicially notice other televised hearings which were anything but decorous.

■ On the other hand we should acknowledge that television equipment is entering the hearing rooms and courtrooms of the nation for purposes other than news gathering. Depositions are being videotaped. Complete trials are being videotaped, edited and played back "error free" to live juries. Experiments are being conducted in the video recording of trials for purposes of review. Thus, a plenary hearing may show that the apprehensions of television stimulated excesses are no longer valid. But the record thus far does not warrant such a finding.

■ While the content of communication enjoys virtually absolute First Amendment protection, the manner of communication does not. Thus the time, the place and the means of communication can be regulated for the purpose of safeguarding other interests of a free society. *Cox v. Louisiana,* 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965) (*Cox II*); *Adderly v. Florida,* 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966). Assuming, as defendants concede, that the First Amendment similarly protects the gathering of news at a public hearing, the question remains whether the manner of gathering news at such a hearing through television filming and taping can be regulated or prohibited. Certainly *Estes* and the such other authorities as there are suggest that it can. On the record to date we cannot say that plaintiff has shown that probability of success on the merits as to entitle it to the broad preliminary relief it seeks—an injunction restraining defendants from prohibiting the filming or videotaping of its hearings.

Nor do we conclude that the public interest would be served by an adjudication of constitutional doctrine as potentially far reaching as that which plaintiff seeks without a full hearing into the nature of the equipment to be used and the impact of television on the participants in the hearing.

There remains, however, the question whether defendants can prohibit the filming or videotaping of Commission hearings on the basis of an unwritten policy which the evidence shows has been sporadically

enforced. The Rules of the Commission do not prohibit the activity in which plaintiff seeks to engage. All that exists is defendant Lieberman's assertion that, "it is the policy of the Commission to prohibit filming, photographing and tape recording during hearings." Plaintiff asserts that the policy is "overbroad." But its breadth is quite explicit. Once the hearing begins, filming and videotaping must stop.

 Plaintiff is engaged in a lawful activity. The dissemination of information with respect to the business of the Commission is clearly constitutionally protected, regardless of whether or to what extent plaintiff enjoys a First Amendment right to employ film or videotape devices in gathering of the news. In these circumstances we think it clear that any prohibition against television equipment must be based upon something other than an unwritten·policy which can change (and evidently has changed) according to the predilections of those holding office, or the subject of the particular hearing in question.

In *Cox v. Louisiana,* 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965) (*Cox I*), a state statute prohibited all street assemblies and parades. In practice, however, certain assemblies or parades were permitted by the public officials charged with enforcement of this statute. They exercised unfettered discretion in their application of the statute. The result was constitutionally impermissible censorship of communication; infringement of the right of assembly; and a threat to the right of a person or group not to be denied equal protection of the law. As a consequence, the Court reversed a conviction for a violation of the statute of the leader of a civil rights group which paraded in the face of an order to disband.

The First Amendment and equal protection teachings of *Cox I* are applicable here. While we are not prepared to hold on the record thus far that plaintiff has the right to televise the Commission's hearings in the face of an explicit rule prohibiting that activity, the rule must be precise and uniformly applied. *Compare, Forcade v. Knight,* 416 F.Supp. 1025 (D.C.C.1976).

In deference to the Commission we shall refrain from issuing a preliminary injunction for a period of 30 days. If during that time the Commission adopts a precise rule of uniform application, the question of its validity can be brought here by way of a supplemental complaint and adjudicated on the merits in light of plaintiff's primary First Amendment contentions. Should the Commission decline to adopt such a rule, we will entertain a renewed motion for preliminary relief.

For the foregoing reasons, the motion for preliminary injunction is denied.