## COCA-COLA CO. v. FEULNER.
### No. 398.

District Court, S. D. Texas, Houston Division.

July 26, 1934.

Harold Hirsch & Marion Smith, of Atlanta, Ga., and Baker, Botts, Andrews & Wharton, of Houston, Tex. (Frank Troutman, of Atlanta, Ga., and Dillon Anderson, of Houston, Tex., of counsel), for plaintiff.

Snell & Aynesworth, of Houston, Tex., for defendant.

HUTCHESON, Circuit Judge.

■ This is a civil contempt proceeding in furtherance of the objects of the original suit to prevent defendant from wrongfully selling spurious, that is diluted, Coca-Cola for the genuine, the undiluted, article. The law of the case is well settled. Without doubt, a retailer of Coca-Cola syrup may, in offering it for sale, dilute it as he pleases so long as it is sold as a diluted product. He may not, however, secretly dilute it and sell it as undiluted. Coca-Cola Co. v. Brown & Allen (D. C.) 274 F. 481; Coca-Cola Co. v. Brown (D. C.) 60 F.(2d) 319; Hydraulic Press Brick Co. v. Stevens (C. C. A.) 15 F.(2d) 312; Lysol, Inc., v. Montgomery (D. C.) 23 F.(2d) 682; Northam Warren Corporation v. Universal Cosmetic Co. (C. C. A.) 18 F.(2d) 774.

■ A civil contempt proceeding is in effect a continuation of the original suit. The jurisdiction invoked and asserted to make the decree effective is as broad and comprehensive as that which sustains the decree itself. Leman v. Krentler-Arnold Hinge Last Co., 284 U. S. 449, 52 S. Ct. 238, 76 L. Ed. 389. It is for the benefit of the complainant; the punishment meted out in it is remedial. Gompers v. Buck's Stove & Range Co., 221 U. S. 431, 31 S. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874. A proceeding for criminal contempt, on the other hand, is to vindicate the authority of the court and the sentence is punitive. Gompers v. Buck's Stove & Range Co., supra. In proceedings for criminal contempt, the defendant is presumed to be innocent and must be found guilty, and no contempt order will issue unless the defendant is proven guilty beyond a reasonable doubt. Id. In those for civil contempt, there is no presumption, and proof of the contempt need not be beyond a reasonable doubt. Oriel v. Russell, 278 U. S. 358, 49 S. Ct. 173, 73 L. Ed. 419. While this is so, a bare preponderance of the evidence will not suffice to hold one even in civil contempt. Proof of violation must be clear and convincing. Oriel v. Russell, supra; City of Campbell, Mo., v. Arkansas-Missouri Power Co. (C. C. A.) 65 F.(2d) 425. When it is, because the proceeding is remedial in its nature, the court should not withhold but should issue an order designed and effected to fully remedy the situation complained of. Leman v. Krentler-Arnold Hinge Last Co., supra.

■ The proper relief here, if a case has been made out, since there is proof neither of defendant's profits nor of plaintiff's damages outside of the expenses of the suit, would be a fine in the amount of plaintiff's out-of-pocket expenses about this suit. Krentler-Arnold Hinge Last Co. v. Leman (C. C. A.) 50 F.(2d) 699; Cheatham Electric Switching Device Co. v. Transit Development Co. (C. C. A.) 261 F. 792; Kreplik v. Couch Patents Co. (C. C. A.) 190 F. 565. What difficulties attend the disposition of this case arise out of the fact contentions they are inherent in the testimony itself.

Plaintiff insists that the record makes out a clear case of violation. Defendant, that viewing the evidence in the light most favorable to plaintiff, there is at best a bare preponderance. This is the record.

On September 17, 1929, plaintiff, suing for an injunction and damages, filed its petition alleging in substance that the defendant, in response to orders for Coca-Cola, was selling as Coca-Cola not the genuine, but a diluted and therefore ungenuine, product.

The matter was set down for hearing on November 11, 1929, plaintiff to have thirty days for its affidavit proof, defendant fifteen days for reply. Within the time limited, plaintiff filed affidavits showing that at various times it had procured samples of the product defendant was selling as Coca-Cola, that it had caused these products to be analysed, and that in the opinion of the affiants, the product was not Coca-Cola.[1] Defendant filed no controverting affidavits. On November 18th, a temporary injunction was issued, restraining defendant from:

(a) Infringing upon the trade rights of plaintiff and from substituting a spurious syrup for the syrup of the plaintiff.

(b) Selling and delivering in response to calls for "Coca-Cola" any beverage other than that made from Coca-Cola syrup manufactured by plaintiff.

(c) Marketing any product of the same identical or similar color so long used by plaintiff in its product, other than Coca-Cola manufactured by plaintiff.

(d) Drawing from the fountain or other container for the purpose of mixture and sale as Coca-Cola any syrup other than the unadulterated and unaltered syrup made by plaintiff and known as "Coca-Cola."

On March 23, 1931, defendant Feulner consenting, the temporary injunction was made permanent.

On May 15, 1934, plaintiff, alleging that the terms of the injunction had been and were being violated by defendant, moved in the cause for a contempt order. Defendant appeared to the rule, and there was a full hearing. Plaintiff offered proof which, if believed, showed that what had been purchased as Coca-Cola from Feulner's Drug Store in April of this year was not Coca-Cola as manufactured and distributed by it for sale, but a diluted product substantially different in color and content. The proof consisted of analyses of liquids purchased at the Feulner fountain in January and March, 1934,[2] proof in camera, DuPont De Nemours Powder Co. v. Masland, 244 U. S. 103, 37 S. Ct. 575, 61 L. Ed. 1016; Herold v. Herold China & Pottery Co. (C. C. A.) 257 F. 911; Taylor Iron & Steel Co. v. Nichols, 73 N. J. Eq. 684, 69 A. 186, 24 L. R. A. (N. S.) 941, 133 Am. St. Rep. 753; Wigmore, 26 Ill. Review 564, of the phosphoric acid and caffein content of Coca-Cola as plaintiff manufactured it and put it out for vending, and the opinions of expert chemists and persons dealing with and acquainted with the constituents of Coca-Cola that the liquids analyzed were not Coca-Cola, but dilutions of it. Plaintiff proved further the small purchases from Coca-Cola distributors defendant had made in the period in question, and argued from that that he must be diluting his product to make it go so far.

Defendant countered by proving that for some time he had been buying his Coca-Cola from the Auditorium Drug Store, a retail druggist, in small quantities of a gallon or two at a time. He explained that he did this because he could buy it in these small quantities from the druggist who had bought in large quantities, at a price less than he would have had to pay the distributor for small quantity purchases, and that he was not financially able to buy in large quantities to get the cheaper price. He also swore positively, and put on persons in and who had been in his employ to swear, that they had not made nor noticed the making of any changes or adulterations. In addition, he offered proof of analyses made by chemists of samples of Coca-Cola they had taken from various places; one from a gallon of syrup purchased by defendant from the local distributor and taken to the chemist for analysis; the other, samples taken from drinks purchased from several fountains, including Feulner's. These analyses, as testified to by Coguenheim, the chemist who made them, unlike those testified to by Chason, were stated

---

[1] These analyses expressing the phosphoric content in terms both of phosphoric acid and phosphorus pentoxide are as follows:

Barnett's analyses

| Date | Phosphoric Acid | Phosphorus Pentoxide | Caffein |
|---|---|---|---|
| 6-27-28 | .148 | .107 | .055 |
| | .143 | .104 | .050 |
| | .152 | .110 | .047 |
| 11-30-28 | .190 | .138 | .035 |

Chason's analyses

| | | | |
|---|---|---|---|
| 11-14-28 | .186 | .135 | .072 |
| | .185 | .134 | |

Caspari's analyses

| | | | |
|---|---|---|---|
| Aug. 1929 | .189 | .137 | .082 |
| | .192 | .139 | .082 |
| | .195 | .141 | .077 |

[2] These analyses were expressed only in terms of phosphoric acid, converted by the agreed formula multiplying by .7244. What Chason found is:

| Phosphoric Acid | Phosphorus Pentoxide | Caffein |
|---|---|---|
| .224 | .162 | .079 |
| .222 | .161 | .080 |
| .219 | .159 | .080 |
| .214 | .155 | .072 |
| .215 | .156 | .072 |
| .210 | .152 | .073 |

in terms of $P_2O_5$ Phosphorus Pentoxide. As so stated, they were:

| $P_2O_5$ | Caffein |
|---|---|
| .223 | .092 |
| .212 | .080 |
| .221 | .105 |
| .230 | .088 |
| .231 | .078 |

Converted to $H_3PO_4$ phosphoric acid by the use of the agreed formula multiplying by 1.38, they would be:

.308
.293
.305
.317
.319

It is interesting to note that Mr. Coguenheim not knowing that plaintiff's chemist had expressed the phosphoric acid contents in terms of $H_3PO_4$ testified, at considerable length, to the remarkable similarity of his results and those of plaintiff's chemist in finding almost the same amount of acid in his samples as plaintiff had found in the ones they took from defendant. When his attention was called to the fact that instead of there being a similarity, there was a great discrepancy because of the different form of expression of the phosphoric acid content, and that in fact he had found in the samples of Coca-Cola he analyzed considerably more phosphoric acid than the in camera testimony showed was ever originally placed in it, he made no explanation. In their brief, defendant's counsel did undertake, by submitting a tabulation of the contents expressed by weight and by volume, but not supported by any evidence, to try to explain some of this discrepancy away. In view of the fact that there is no testimony to which this attempted explanation can relate, or by which it can be tested, and that no request has been made to reopen the case for the purpose of making this explanation, it must be disregarded, and the case decided on the evidence as it stands.

Coguenheim, in addition to testifying to the analyses, swore that it was impossible to analyze with absolute exactness and that exact results could not be obtained except within tolerance limits. He testified that analyses of phosphoric acid varying from each other not more than 5 per cent. were within permissible limits; that a variance no greater than that would indicate that the product tested was running the same Plaintiff's chemists testified as to the ingredients of phosphoric acid and caffein in Coca-Cola, that they could and did run their tests, and that they did manufacture and sell Coca-Cola, within variance limits of 1 per cent. Upon this testimony, the case was at first submitted. Plaintiff stood on it, asserting that the variances found by plaintiff's witnesses from the ideal or assumed content of Coca-Cola were such as, after allowing for all permissible variations in analyses due to the human equation, to show that there must have been a dilution, and also to negative the possibility that it had been accidental or unintentional. Defendant asserted that there having been no direct testimony as to dilution, the circumstantial evidence furnished by the chemical analyses was not sufficient in the light of the testimony of his chemist as to tolerances permitted in such analyses to make a case of violation of the contempt order in the face of defendant's positive testimony that he had neither made nor authorized any dilution. Whereupon the case was submitted, briefs to be filed within time fixed.

Shortly thereafter, and before briefs were prepared, on plaintiff's motion to reopen the case to offer newly discovered testimony of ex-employees of Feulner that they had under his orders cut the Coca-Cola syrup with plain syrup, there was a further hearing. This consisted of oral testimony of ex-employees who had dispensed soda for Feulner that they had cut the syrup on his orders and that this had been a common practice. Some of these ex-employees testified without contradiction that Feulner had talked with them in the early morning hours after their names had been disclosed in the motion to hear additional testimony, and had told them that if they were going to testify that they had cut the syrup, they should not say that it was done under his orders. McCabe, an ex-employee of Feulner, put on by him in rebuttal, testified that he had told these witnesses of plaintiff that they ought not to go over there and tell anything on Feulner because the practice of cutting Coca-Cola syrup was common, was done in all the stores, and did not amount to anything anyway. In addition to this testimony, there was testimony of one of the defendant's witnesses that plaintiff's witness Salter, a former employee of Feulner, and a kind of special officer, had told him that there would be a hundred dollars apiece in it for any of the ex-employees of defendant who would testify what the Coca-Cola Company wanted. There was also, as to Salter, testimony that he had been discharged because of some shortage in the cash. Salter denied all of these charges, denied that he had any special interest in the case, denied that he had been discharged, and maintained that he had quit Feulner's employ because he was unwilling to take the responsibility for cash lost through no fault of his. The defendant him-

self did not take the stand to deny any of this new testimony. He contented himself with offering evidence tending to show that the employees testifying against him had either been discharged by him or had left his employ in a state of bad feeling toward him. I think it certain that there is a clear preponderance of the evidence in favor of plaintiff's claim that the injunction of this court has been violated and that adulteration has been going on, not to as gross an extent as was the case when the injunction was granted, but to an extent sufficient to bring the defendant within the condemnation of the law. It may be that if this were a criminal contempt, the defendant's denials, the animus of the witnesses who testified to making adulterations at his orders, and the claimed fallibility of the chemical tests would, in connection with the presumption of innocence, raise a reasonable doubt as to his guilt. But this is not a criminal contempt. Here there is no presumption of innocence raised. Here proof need not be beyond a reasonable doubt. It is enough if it reasonably appears that the defendant has been indulging in the practices he was enjoined from engaging in. The positive testimony of each of four ex-employees that he has is opposed only by a general sworn denial of defendant that he has never cut or authorized the cutting, entered not after, but before, they had testified, and the negative testimony of three witnesses of defendant that they had never cut or been requested by Feulner to cut the syrup. There is the positive testimony of plaintiff's chemists as to their analyses of the samples taken from the defendant's place, their positive opinion that these samples had been adulterated, and their equally positive testimony that the variances they found from the product as manufactured and put out were bound to have been the result of deliberate dilution because far beyond any permissible limits. There is the positive testimony, too, of other witnesses for the plaintiff as to the care taken by plaintiff company in mixing the ingredients for and preparing the syrup and as to the numberless minute tests and precautions made to bring and keep the product within the closest limits of variance. Opposed to this mass of positive testimony was only the negative testimony of defendant's chemist, experienced indeed generally in making chemical tests but without experience in testing Coca-Cola. This testimony consisted of the results of tests he made of samples of Coca-Cola selected from Feulner's and other fountains and from a carton of syrup obtained from a local distributor, and his opinion that the phosphoric and caffein content was substantially the same as that found by plaintiff's chemists in the Feulner samples complained of. Aside from the obvious weakness of these tests he made, called attention to by plaintiff's objections to them that they were valueless without proof that the Coca-Cola from which the samples were taken had not itself been tampered with, these tests and the evidence in regard to them exhibit other and more fatal defects. The first and most fatal of these is that the similarity between the phosphoric content of Coguenheim's samples and those of Chason's, which Coguenheim's were offered to prove, entirely disappears when the fact is faced that plaintiff's results were stated in terms of phosphoric acid $H_3PO_4$; defendant's of phosphorus pentoxide, the anhydride of phosphoric acid, of which the formula is $P_2O_5$. This recognized there appears instead of a variance of from .001 to .021, a variance of from .060 to .109. But this is not all. In the caffein content itself, all of Coguenheim's results but one showed a richer content than Chason's, and one of them showed a variance of more than .25. Too, one of the fountain samples testified to by Coguenheim showed more caffein content than plaintiff claims ever to put in the product as manufactured and put out for sale. But it is not these things alone which tend to discredit and weaken the effect of defendant's expert testimony. It is, I think, most weakened by Coguenheim's generalization that chemical tests for the presence of ingredients in as small quantities as those which make up the drink Coca-Cola cannot be made closer than within .05, and it is conclusive that his own evidence bears out this generalization. In the first place, it seems more likely that plaintiff's chemists, experienced in handling and testing Coca-Cola as they are, would be more reliable guides when they swear that they not only can, but do, make their tests within a range of variance of .01, than defendant's chemist is when he swears it cannot be done closer than within .05. But leaving opinion aside and looking at the tests themselves, they show that both plaintiff's and defendant's chemists could and did make tests showing variances within a range greatly less than .05; in fact, within one less than .01.

I think the whole case may be summed up as one in which plaintiff's proof, direct and circumstantial, clearly and convincingly establishes the violation of the decree. Plaintiff is entitled to and should have an order, imposing a remedial fine for its benefit of $466.17, the reasonable amount of the out-of-pocket expenses to which it has been put.

Order may be taken accordingly.