539 F.2d 458
 76-2 USTC P 9711
 UNITED STATES of America and Edwin Chandler, III, Special
Agent of the Internal Revenue Service, Plaintiffs-Appellees,
v.
Virgil R. RIZZO, M.D., P.A., and Virgil R. Rizzo, as
President of Virgil R. Rizzo, M.D., P.A.,
Defendant-Appellant.
 No. 75-3455.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 24, 1976.
 
 Robert S. Zack, E. Louis Fields, Fort Lauderdale, Fla., for defendant-appellant.
 Robert W. Rust, U. S. Atty., Mary-Ella Johnson, Asst. U. S. Atty., Miami, Fla., Scott P. Crampton, Gilbert E. Andrews, Crombie J. D. Garrett, William A. Whitledge, Tax Div., Dept. of Justice, Washington, D. C., for plaintiffs-appellees.
 Appeal from the United States District Court for the Southern District of Florida.
 Before DYER, SIMPSON and RONEY, Circuit Judges.
 SIMPSON, Circuit Judge:
 
 
 1
 Dr. Virgil R. Rizzo, individually and as president of Virgil R. Rizzo, M.D., P.A., (hereinafter referred to in the singular, as appellant or Dr. Rizzo) appeals from a September 3, 1975 order of the district court which held him in contempt and fined him $21,950 for failure to produce certain records sought by the Internal Revenue Service in compliance with a prior court order. In addition, Dr. Rizzo was ordered jailed until the records sought were produced. We reverse.
 
 
 2
 Dr. Rizzo is a physician practicing as a professional association under Florida law.[1] His fiscal year begins August 1 and ends July 31 of each calendar year.
 
 
 3
 Under Rizzo's record-keeping system a "patient payment card" was made for each patient upon that patient's first visit to the doctor's office. When the doctor saw a patient, a record of the services rendered was first recorded on that patient's chart. This information was then transferred to the patient payment card, either by the doctor or his office manager. The office manager entered the standard charge for the treatment performed on the card, and billed the patient on that basis. The office manager attended to the billing and record-keeping functions of the practice. Appellant did not concern himself with these matters. At the time in question Dr. Rizzo maintained between 10,000 and 15,000 patient cards. Cards for individuals no longer patients were kept in inactive folders with the former patient's other records. Cards for current patients were divided into two groups: cards for those patients with an outstanding balance were kept in an accounts receivable file, while cards on patients owing no money were kept in a separate file.
 
 
 4
 In August of 1973, an Internal Revenue Service aide was assigned to transcribe data from the patient payment cards for use in an audit of Dr. Rizzo's 1972 income tax returns. She was dictating information from those cards onto a tape recorder when she was interrupted by a member of Dr. Rizzo's staff and asked to leave, allegedly because of errors she was making in recording the information from the cards. On May 8, 1974, Edwin Chandler, III, special agent of the I.R.S., issued an I.R.S. summons[2] to Dr. Rizzo which required that he produce business records of his practice including an appointment book, copies of receipts given patients, journals, ledgers, bank records including cancelled checks, deposit tickets, payroll records and patient payment cards. Rizzo complied with the summons, producing the requested items except a number of patient payment cards.
 
 
 5
 Agent Chandler on August 23, 1974, filed a petition in the United States District Court to enforce the summons and require the production of the remaining patient payment cards. On October 15, 1974, following a hearing, the district court ordered Rizzo to produce all the missing cards.
 
 
 6
 On October 24, 1974, agent Chandler went to appellant's office. He there microfilmed those cards sought for which there was a current balance outstanding. He also obtained from Dr. Rizzo sixteen bundles of cards. Chandler compared the cards he had microfilmed and the cards he had obtained with the other records he had previously obtained, and also with the data the I.R.S. aide had originally taped when she visited Dr. Rizzo's office in August, 1973, and thereafter transcribed. Chandler determined that there were at least 130 cards missing. In order to obtain these cards, the United States and agent Chandler on March 27, 1975, filed a petition to enforce the court's prior order, and to hold taxpayer in contempt and fine him in an amount equal to the government's expenses.
 
 
 7
 Rizzo responded by affidavit to the government's petition, alleging that he had instructed his office manager to gather all the cards. He stated that he had not examined the cards himself, nor personally searched the files. He further asserted that if any cards were in fact missing, and in his possession, they had been overlooked because of "excusable neglect".
 
 
 8
 The district court held a hearing on May 15, 1975. At that time appellant produced a further 201 cards. The court warned taxpayer that if he failed to produce any remaining cards, he would be incarcerated until he complied with the court's order. At the government's request, the court imposed a civil contempt fine of $250 on Dr. Rizzo, for failure to turn over the cards initially. The court expressly noted that plane fare from Washington and one day's expense for the government tax attorney approximated that amount. This order was not appealed.
 
 
 9
 After examining the 201 cards that Rizzo had produced at the hearing, the government filed on May 29, 1975, a "Second Petition to Enforce Order of This Court". The government alleged that examination of the 201 cards produced showed that 39 of the cards did not concern the year under investigation, 67 cards were cards of which Chandler had no prior knowledge, 31 cards had been previously microfilmed, with only 64 cards being among those sought. 66 cards which the I.R.S. had demanded were thus still not produced.
 
 
 10
 The court issued an order requiring that appellant show cause why he should not be held in contempt. A hearing was held July 28, 1975. The government, by agent Chandler, introduced into evidence a "schedule" in which the 1,929 cards the government received on October 23, 1974, the 201 cards produced on May 15, 1975, and 15 cards turned over in June, 1975, together with those cards microfilmed in October, 1974, were compared against names listed on Dr. Rizzo's appointment book, information obtained from the I.R.S. aide in her partial audit, entries on appellant's deposit slips, and a schedule of Blue Cross and Medicare payments made to Dr. Rizzo's patients for reimbursement of his fees. From this schedule, Chandler concluded that at least 143 cards had not been produced as ordered by the court on October 23, 1974.
 
 
 11
 Dr. Rizzo testified that he felt that patient payment cards had not been made for every patient; that some of the people listed on the schedule were relatives and friends whom he did not charge for his services; and that in complying with the court's order he did not himself gather the cards, but that he instructed his office manager to locate and turn over to the I.R.S. all the cards. He further testified that he had eventually gone through his files himself and could find no further cards called for in the summons and court order, and that to his knowledge, no card had been concealed or destroyed.
 
 
 12
 Joan Dunn, office manager for Dr. Rizzo, testified that she habitually made a card for every patient; that the cards were her record of billings, and that no cards were ever destroyed. She stated that no cards had been removed from the office, and that every card prepared should be in the office. She explained that some cards might be misfiled, and thus "lost", somewhere within the office.
 
 
 13
 At the conclusion of the hearing the district judge made extensive findings of fact. The court was convinced that the government's evidence was creditable, and that the cards existed. The court held Dr. Rizzo in contempt and ordered him to produce 134 cards.
 
 
 14
 In response to the court's order, appellant submitted 147 cards to the I.R.S. on August 1, 1975. At a hearing September 3, 1975, Dr. Rizzo admitted that most of those cards had been made or reconstituted from his patient's charts specifically to comply with the court's order. The district judge observed that "dummying up" a card was not compliance with his order, and found as follows:
 
 
 15
 "The Court specifically finds that Dr. Virgil R. Rizzo is in contempt of court; has failed to comply with the order of the Court of October 15, 1974, and intervening orders of the Court and only partially complied with . . . the last order of the Court finding Dr. Rizzo, M.D. and P.A. and Virgil R. Rizzo as President of Virgil R. Rizzo, M.D. and P.A. in contempt of court. . . .
 
 
 16
 The Court finds that only when Dr. Rizzo is brought to a court hearing and ordered to show cause does he make grudging compliance with the orders of the Court and with the subpoena of the Internal Revenue Service. The Government has gone to great effort and detail . . . and as I pointed out in my order of July 29th in trying to show exactly which cards should be produced.
 
 
 17
 There has been no evidence produced by the Respondent at this hearing to justify failure to comply fully with the Court's order of October 15th and July 29th, 1975. There has been no evidence even that the twelve names of the eighteen that Mrs. Carter testified about have been produced.
 
 
 18
 The Court specifically finds that dummying up a card just by putting a name on it because that's set forth in the Court's order is not compliance with the Court's order.
 
 
 19
 There has been evidence presented before the Court that the cards were made up from an examination of medical records. The Court finds that some of the cards have nothing more than what is set forth in Government's Exhibit 1.
 
 
 20
 Such grudging and almost insolent production of records is clearly contempt of court. I don't know why I should give you another minute. I never put up with this kind of foolishness from anybody.
 
 
 21
 I am going to give you until 9:30 tomorrow morning to produce all the cards that haven't been produced that I required on July 29th, 1975, and I don't mean dummied up versions.
 
 
 22
 You are ordered to turn them over to the Petitioner at that time or stand committed to the custody of the Attorney General or his authorized representative until such time as those cards are turned over or until otherwise discharged by due process of law.
 
 
 23
 The Petitioner will report tomorrow morning at 9:30 to this Court to advise me whether or not compliance has been performed. If it has not a warrant for Dr. Rizzo's arrest shall thereupon issue forthwith.
 
 
 24
 And in addition the Court imposes the following fine computed in the following manner:
 
 
 25
 For the six cards that were belatedly on the second try, that is, since they weren't turned over in October and weren't turned over in May, but were finally turned over in July, at $50 a card. That will be $300 for those six cards.
 
 
 26
 There were 74 cards turned over in compliance with the Court's order of July 29th, and that will be $100 a card.
 
 
 27
 There are 57 other cards that were dummied up, three of those that were unnecessary because those were the names that I said you didn't have to produce a card for, D. Barnes, John Glade and Marie Glade. The Government may well end up having to do extra work on this and I don't think the taxpayers should have to pay for your failure to produce in this, Dr. Rizzo. Cover that by a fine of $250 a card for those 54 cards, to be a total of $21,200 plus three trips by the Government lawyer down here from Washington. That costs a minimum of $250 a day by the time you count coach airfare and travel expenses.
 
 
 28
 So in addition to the incarceration order it is adjudged you shall pay a fine unto the United States of America in the sum of $21,950 payable within twenty days of date herein, and upon default to stand committed until paid or discharged by due process of law."
 
 
 29
 The next day appellant appeared and stated that he had searched his records and found no more cards. Thereafter, the court issued a bench warrant for appellant's arrest. Dr. Rizzo was released on posting of a $2,500 bond. This appeal followed.
 
 
 30
 The order of the district court did not specify whether Dr. Rizzo was held to be in civil or criminal contempt. The distinction is important; civil and criminal contempt are properly invoked for different purposes, under different procedures, and with different sanctions. "Sentences for criminal contempt are punitive in their nature and are imposed for the purpose of vindicating the authority of the court." United States v. United Mine Workers, 1947, 330 U.S. 258, 302, 67 S.Ct. 677, 700-701, 91 L.Ed. 884, 917. Civil contempt, on the other hand, is to enforce compliance with a court's order, see, e.g., Cliett v. Hammonds, 5 Cir. 1962, 305 F.2d 565, 569, or to compensate a wronged party. United States v. United Mine Workers, supra, 330 U.S. at 304, 67 S.Ct. at 701, 91 L.Ed. at 918. Courts have held it proper to award costs to the I.R.S. for time and travel expenses in other contempt cases. In Re D. I. Operating Co., D.Nev.1965, 240 F.Supp. 672. Judge Morgan, for our Court, enumerated primary traits and characteristics of criminal and civil contempt in Skinner v. White, 5 Cir. 1974, 505 F.2d 685, at 688-689:
 
 
 31
 "The essential distinctions between civil and criminal contempt are that:
 
 
 32
 (1) civil contempt lies for refusal to do a commanded act, while criminal contempt lies for doing some forbidden act;
 
 
 33
 (2) a judgment of civil contempt is conditional, and may be lifted if the contemnor purges himself of the contempt, while punishment for criminal contempt is unconditional;
 
 
 34
 (3) civil contempt is a facet of the original cause of action, while criminal contempt is a separate cause of action brought in the name of the United States;
 
 
 35
 (4) the notice for criminal contempt must indicate the criminal nature of the proceeding. Gompers v. Buck's Stove and Range Company, 221 U.S. 418, 441-445, 31 S.Ct. 492, 55 L.Ed. 797 (1911); De Parcq v. United States District Court for Southern District of Iowa, 235 F.2d 692, 699 (8th Cir. 1956), 11 Wright and Miller, Federal Practice and Procedure, § 2960 (1973)."
 
 
 36
 The penalties and sanctions imposed on Dr. Rizzo at the September 3 hearing incorporate elements of both civil and criminal contempt. We consider first those aspects of the district court's order that we determine to encompass criminal contempt.
 
 CRIMINAL CONTEMPT
 
 37
 The court fined Dr. Rizzo $21,200 computed on the prior performance of Dr. Rizzo in producing the patient payment cards. Different fines were levied for cards turned over at different times, depending upon their degree of tardiness. The fines ranged from $50 for some cards to $250 for others. Although the court made mention that "(t)he government may well end up having to do extra work on this and I don't think the taxpayers should have to pay for your failure to produce in this, Dr. Rizzo", no argument is made that the $21,200 is compensatory in nature, that being a prime indicia of a civil contempt fine.[3] In fact, the government concedes that the sum is a fine for criminal contempt, a fine levied to punish Dr. Rizzo.
 
 
 38
 Title 18 U.S.C., Section 401, the statute codifying the offense of criminal contempt, provides that:
 
 
 39
 "A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as . . . .
 
 
 40
 (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."
 
 
 41
 Punishment for contempt requires that certain procedures be followed to protect the constitutional rights of the defendant. Rule 42(b) of the Federal Rules of Criminal Procedure provides:
 
 
 42
 "(b) Disposition Upon Notice and Hearing. A criminal contempt except as provided in subdivision (a) of this rule shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the United States attorney or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest. The defendant is entitled to a trial by jury in any case in which an act of Congress so provides. He is entitled to admission to bail as provided in these rules. If the contempt charged involves disrespect to or criticism of a judge, that judge is disqualified from presiding at the trial or hearing except with the defendant's consent. Upon a verdict or finding of guilt the court shall enter an order fixing the punishment."
 
 
 43
 The major difficulty with the government's case is non-compliance below with the notice requirement of Rule 42(b). Appellant received no warning that he might be tried for criminal contempt. The government relies upon F. T. C. v. Gladstone, 5 Cir. 1971, 450 F.2d 913, for the proposition that the word "criminal" need not appear in the purported notice if the defendant is apprised of the action which formed the basis of the contempt. In that case, the Federal Trade Commission issued a subpoena duces tecum to Gladstone requiring that he appear and produce documents specified in the subpoena. Gladstone neither appeared nor produced the documents. The district court held two hearings on the enforcement petition, then ordered Gladstone to comply. Gladstone and his employees thereafter removed numerous documents from the subpoenaed files and destroyed them. The Commission, upon learning of Gladstone's actions, filed a motion asking that Gladstone be held in contempt. The court issued a "show cause" order to Gladstone. A hearing was held on the F.T.C.'s motion. The court concluded Gladstone had willfully violated the court's prior order by destroying the subpoenaed documents, and sentenced him to jail for criminal contempt.
 
 
 44
 We held, in discussing Gladstone's argument asserting inadequate notice under Rule 42(b), that:
 
 
 45
 "The Mine Workers case teaches that reversal is required only where there is a showing that there was prejudice to the contemnor as a result of the failure to clearly designate the nature of the contempt proceeding. In the case at bar, we entertain no serious belief that Gladstone was prejudiced. The notice given Gladstone fully described the conduct which formed the basis of the contempt charge. There is no indication in the record that Gladstone was confused as to the nature of the contempt proceeding. Certainly it must have been plain to Gladstone and his lawyers that the contempt hearing was not a civil proceeding for the purpose of coercing production of the records. The records had already been destroyed. The only conceivable purpose for the hearing was to determine whether Gladstone should be punished for destroying the documents. At the hearing, Gladstone raised no objection to the notice given him. During the hearing, Gladstone was accorded all the procedural rights due the defendant in a criminal contempt hearing. 2 In light of all these factors, we conclude that no prejudice resulted." (Footnote omitted)
 
 
 46
 F. T. C. v. Gladstone, supra, 450 F.2d at 916.
 
 
 47
 Here the notice the government relies on as received by appellant consisted of a portion of a show cause order dated August 22, 1975, ordering Dr. Rizzo to appear and "to show cause why (he) should not be held in contempt of the Order of the Court entered on October 15, 1974, and compelled to produce the patient payment cards." Several other orders to the same effect had been entered. It is obvious that in this case, contrary to the situation in Gladstone, the declared primary object of the contempt hearing was to coerce Rizzo into producing the patient payment cards. This use of contempt to coerce production, to force the defendant to do something rather than punish him for something done, is of course the hallmark of a civil contempt sanction. The notice received by Dr. Rizzo indicated only that civil contempt proceedings were contemplated, and we conclude that inadequate notice to support criminal contempt proceedings was given. Because of this deficiency, we reverse appellant's conviction and vacate the $21,200 fine.[4]
 
 CIVIL CONTEMPT
 
 48
 Certain portions of the contempt order are civil in nature. Judge Roettger imposed a $250 fine on Dr. Rizzo for each of three trips the I.R.S. counsel made to Florida. This $250 was to cover round trip coach air fare and other expenses. Such a compensatory fine is civil in nature. Norman Bridge Drug Co. v. Banner, 5 Cir. 1976, 529 F.2d 822, 827. Dr. Rizzo was ordered incarcerated until he produced the cards. This coercive imprisonment, contempt of which he could purge himself should he produce the cards, is civil. Shillitani v. United States, 1966, 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622, 627; Scott v. Hunt Oil Co., 5 Cir. 1968, 398 F.2d 810.
 
 
 49
 Dr. Rizzo argues that the government failed to prove contempt. The court's order of October 24, 1974, enforcing the I.R.S. summons, placed appellant "under a duty to make in good faith all reasonable efforts to comply", United States v. Ryan, 1971, 402 U.S. 530, 534, 91 S.Ct. 1580, 1583, 29 L.Ed.2d 85, 89, with the original I.R.S. summons.[5] Rizzo urges that he has made this good faith effort; that he has produced all the pertinent patient payment cards he can find. The question then is simply whether or not the government proved its case. We think that it failed to do so.
 
 
 50
 In a civil contempt action the proof of the defendant's contempt must be "clear and convincing", a higher standard than the "preponderance of the evidence" standard, common in civil cases, although not so high as "beyond a reasonable doubt".[6] Stringfellow v. Haines, 2 Cir. 1962, 309 F.2d 910, 912; A. H. Robins Co. v. Fadely, 5 Cir. 1962, 299 F.2d 557, 559; Coca-Cola Co. v. Feulner, S.D.Tex.1934, 7 F.Supp. 364, 365.
 
 
 51
 Primarily, the government's proof relied upon to show Dr. Rizzo's failure to comply with the court's order was the schedule, described in detail, supra, characterized by the court as "one of the most comprehensive and detailed exhibits I have ever seen." Conceding that this schedule, produced from several sources, was a thorough and comprehensive piece of work, of considerable help to the trial court, it was by no means an infallible indication that the cards designated by the I.R.S. were in existence. On September 4, 1975, the day after the district court's contempt order was issued, the I.R.S. determined that five additional cards demanded did not in fact exist, reducing to 111 the total cards the government sought from Dr. Rizzo. The most convincing portion of the schedule, and consequently that most damaging to Dr. Rizzo, contained the names taken from cards seen and recorded by the I.R.S. aide in August, 1973. Twelve of the cards not produced appear to be in this group.
 
 
 52
 Appellant stresses several points as showing that there was insufficient proof of contempt. There was no testimony that Dr. Rizzo attempted to destroy cards, or had an intent to do so, or that he willfully and deliberately withheld production of any cards. To the contrary, the testimony showed that Dr. Rizzo had ordered his office staff to produce all the cards in his possession. The government established, by means of testimony from Joan Dunn, appellant's office manager, that cards were routinely made for every patient, and that no cards were ever destroyed. Dr. Rizzo explained that he "suspected" cards were not made for every patient, and that he "assumed" some of the cards may have been sent with patient files to other doctors. He maintained approximately 15,000 patient payment cards, not kept in chronological order by year, but held instead in three separate files according to the patient's current status with the Doctor. Some confusion in locating certain cards from a certain year, assuming their existence, is not only likely under a system such as this; it is almost inevitable. A great volume of records was produced initially. Further cards trickled in. The arguable existence of the cards, while relevant, is not dispositive of the issue of whether Dr. Rizzo made a good faith effort to comply with the court's order.
 
 
 53
 The government argues that the evidence produced by I.R.S. agent Chandler was a reasonable basis for his belief that Dr. Rizzo possessed the cards subpoenaed, and that the burden thereupon shifted to appellant to explain or justify his inability to produce the cards. McPhaul v. United States, 1960, 364 U.S. 372, 81 S.Ct. 138, 5 L.Ed.2d 136; see also Angiulo v. Mullins, 1 Cir. 1965, 338 F.2d 820.
 
 
 54
 In McPhaul the defendant was held in criminal contempt, after a trial, for his prior refusal to comply with a subpoena and produce certain documents before a House of Representatives subcommittee. The defendant never attempted to assert that the records called for by the subpoena did not exist or were not in his control. His claim was that the government failed to show that he could have produced the records. The Supreme Court held:
 
 
 55
 "The Government's proof at the trial thus established a prima facie case of willful failure to comply with the subpoena. The evidence of the Subcommittee's reasonable basis for believing that the petitioner could produce the records in question, coupled with the evidence of his failure even to suggest to the Subcommittee his inability to produce those records, clearly supported an inference that he could have produced them. The burden then shifted to the petitioner to present some evidence to explain or justify his refusal. Morrison v. California, 291 U.S. 82, 88-89, 54 S.Ct. 281, 284, 78 L.Ed. 664. But he elected not to present any evidence. In these circumstances, there was no factual issue, respecting the existence of the records or his ability to produce them, for resolution by the jury."
 
 
 56
 364 U.S. 379, 81 S.Ct. 143, 5 L.Ed.2d 142.
 
 
 57
 Unlike the defendant in McPhaul, Dr. Rizzo has from the beginning attempted to explain his inability to produce the cards sought by the I.R.S. despite good faith diligence in trying to locate them.
 
 
 58
 Assuming arguendo that Chandler's proof was sufficient to show a reasonable basis for belief not only that the cards sought were in existence, but that Dr. Rizzo was capable of producing them, we hold that under the facts of this case Dr. Rizzo rebutted any presumption that he was able but unwilling, to produce the cards.
 
 
 59
 Dr. Rizzo and Mrs. Dunn testified to going through the files, searching for the cards, several times. These searches appear to have become more thorough as the I.R.S., through court action, intensified the pressure on Dr. Rizzo. Some cards were subsequently discovered by Dr. Rizzo, and turned over to the I.R.S., as a result of this pressure. But that in itself is no proof that Dr. Rizzo did not initially make a good faith effort to produce all the cards sought.
 
 
 60
 Carefully weighing the circumstances present, we hold that clear and convincing proof of contempt was not made out. Accordingly, we reverse the civil portion of the contempt order against Dr. Rizzo, as well as the criminal contempt portion previously discussed.
 
 
 61
 REVERSED.
 
 
 
 [1]
 See "Professional Service Corporation Act", Fla.Stat. ch. 621
 
 
 [2]
 Internal Revenue Code, Section 7602 (1954)
 
 
 [3]
 United States v. United Mine Workers, 1947, 330 U.S. 258, 304, 67 S.Ct. 677, 701, 91 L.Ed. 884, 918; Nye v. United States, 1941, 313 U.S. 33, 42, 61 S.Ct. 810, 813, 85 L.Ed. 1172, 1177
 
 
 [4]
 Because we reverse the district court for the absence of notice given appellant, we pretermit any discussion of whether or not contempt was proven "beyond a reasonable doubt" as is required in contempt cases. See, e. g., United States v. Columbia Broadcasting System, Inc., 5 Cir. 1974, 497 F.2d 107
 
 
 [5]
 In United States v. Thompson, 2 Cir. 1963, 319 F.2d 665, the Court of Appeals determined that the question of fact which should have been determined in a civil contempt proceeding brought against a witness who contended he was too sick to comply with a subpoena was not the medical determination of whether or not the witness was physically able to comply, but whether he in good faith believed he was unable to comply
 
 
 [6]
 In United States v. Columbia Broadcasting System, Inc., 5 Cir. 1974, 497 F.2d 107, we observed, in explaining that criminal contempt must be proved beyond a reasonable doubt, that "(t)his is unlike civil contempt which could be proved by preponderance of the evidence", citing in support of this proposition A. H. Robins Co. v. Fadely, 5 Cir. 1962, 299 F.2d 557. However, in Robins the court held, at 299 F.2d 559, "that in a civil contempt action, guilt must be established by clear and convincing evidence". It appears that the purpose of the statement in Columbia Broadcasting System, supra, a criminal contempt case, was no more than to emphasize that in criminal contempt a higher standard of proof is required than in civil contempt. Obviously, the Court in that case did not undertake by dictum to establish a new standard for civil contempt cases