**Carlos MORALES FELICIANO, et al., Plaintiffs,**

**v.**

**Rafael HERNANDEZ COLON, et al., Defendants.**

**Civ. No. 79–4(PG).**

United States District Court, D. Puerto Rico.

Dec. 30, 1988.

See also, 697 F.Supp. 51.

Harvey B. Nachman, Harry Anduze, Santurce, P.R., Carlos García–Gutiérrez, Hato Rey, P.R., Rafael Pérez–Bachs, San Juan, P.R., José Fernández–Seín, Carlos E. Ramos, Santurce, P.R., Nora Rodríguez, Hato Rey, P.R., and Ivonne Díaz de Carrera, Legal Assistance Clinic, University of Puerto Rico School of Law, Río Piedras, P.R., for plaintiffs.

Marcos Ramírez, Hato Rey, P.R., and Dept. of Justice, Com. of Puerto Rico, San Juan, P.R., for defendants.

## OPINION AND ORDER

PEREZ–GIMENEZ, Chief Judge.

The matter is before this Court on a motion for contempt filed by Domingo Grajales Cardona, a member of plaintiffs' class, against Mercedes Otero de Ramos, Administrator of the Correction Administration of the Commonwealth of Puerto Rico; Captain Domingo Alvarez, Deputy Administrator for Security Affairs of the same agency; Sergeant Benito Torres; Heriberto Torres and José Ramón García, custody officers employed by the Correction Administration. Mr. Grajales ("complainant") claims that these individuals have failed to comply with various outstanding orders issued by the Court which prohibit retaliation against members of the plaintiffs' class who appear as witnesses or otherwise communicate with the Court in the exercise of their constitutional rights.

A hearing which lasted three days was held to ascertain if the contemptuous conduct had taken place. The action against Ms. Otero was dismissed in open court after the complainant failed to meet the standard of proof required in civil contempt proceedings.[1] A similar request by the other respondents was denied.

Much of the evidence submitted by the parties consisted of oral testimony. Some documentary evidence was also presented. After observing the demeanor of the witnesses and taking into consideration the other evidence submitted, the Court makes the following findings of fact and conclusions of law.

### Findings of Fact

1. On September 13, 1988, two attorneys representative of plaintiffs' class, Harvey B. Nachman and Carlos Ramos González, conferred with Mr. Domingo Grajales Cardona at the Guayama Regional Detention Center, "Annex 292". The interview was conducted inside the dormitory area of the complainant while he remained in his individual cell. This area is identified as Building Four, Section C. The interview lasted from 8:45 P.M. to 10:00 P.M.

2. Messrs. Nachman and Ramos visited Grajales in response to a *pro se* complaint drafted by the latter and addressed to this Court. The complaint raised several issues concerning the conditions of confinement at the "Guayama Annex". On August 24, 1988, the Court referred a copy of the complaint to the law office of Mr. Nachman, who is the lead counsel in a group comprising seven attorneys that represent the prisoners' class.

3. Access into the prison, and the corresponding individual cells, was obtained by the aforementioned attorneys pursuant to an outstanding order of the Court issued on January 3, 1980, which authorized such entry.[2] These visits have been performed on numerous occasions since the issuance of the order.

4. The visit of September 13, 1988, was widely commented on by the custody officers of the Guayama prison. Following standard procedures, the visit was registered in the "Lawyers Log Book", usually kept at the entrance of the institution (Exhibit 2). This particular visit was also annotated in the "Novelty Log Book" also kept at the institution (Exhibit B(2)). Both entries identified the name of the above mentioned attorneys. The latter also identified the dormitory area which was visited by them, that is, Building Four, Section C. The annotation also served as notice and source of knowledge about the visit to other custody officers, including Torres, García and Martínez.

---

1. The standard of proof in this type of proceedings is that of "clear and convincing evidence". *United States v. Rizzo,* 539 F.2d 458, 465 (5th Cir.1976).

2. The pertinent section of this order reads: "...that the seven attorneys who appeared at trial shall be permitted to enter into any of the institutions operated by the Administration of Corrections and to confer with their clients and to inspect any of the conditions covered in this Order." *Feliciano v. Barceló,* 497 F.Supp. 14, 41 (D.P.R.1980).

5. On the next day following the visit, that is, September 14, 1988, at or about 8:30 A.M., Sergeant Benito Torres, officers Heriberto Martínez and José Ramón García removed the complainant from his cell. Although initially told that he was to be taken to the admissions area, he was taken to a recreation area known as the "cajones" ("the boxes"). These are open ceiling recreational facilities with dimensions of approximately $20' \times 30' \times 8'$. Once *in front* of the entrance of one of the "cajones", Grajales was handcuffed. Promptly thereafter, Sergeant Torres grabbed him while officer Martínez punched him in the stomach and officer García slapped his face. In the meantime, he was told phrases such as "charlatán", "here we are in command", "we do not work under pressure". Once beaten, he was pushed into the "box" and locked inside it. Officer García obtained a "tear gas shot gun" from an unidentified custody officer assigned to a special force unit. García fired tear gas cannisters against the complainant. The bombs exploded near him, and although he was not burned by them, the complainant suffered smoke inhalation and experienced the pain associated with it. He further suffered the pain and anguish caused by being hit on the stomach and slapped on the face.

6. Tear gas bombs are usually kept on hand by members of the aforestated "special forces" of the security staff of the Administration of Correction. The distribution of these "bombs" to members of the "special forces" is not necessarily registered in the official logs kept for this purpose at the Armory of the institution (Exhibit I).

7. The complainant was left alone at the "box" for several minutes. While inside, he was able to pick up several components of the cannisters and bomb shells fired against him (Exhibit 1). He was then removed from the area and taken back to his cell by the same three custody officers. While being placed in his cell, defendant García told complainant that "we are acting upon orders issued by Domingo Alvarez". This statement was also heard by other inmates next to Grajales' cell.

8. Mr. Domingo Alvarez is the Deputy Administrator for Security Affairs of the Administration of Correction. He is a member of the Police Department of the Commonwealth of Puerto Rico and is presently on leave of absence without pay. He works under the supervision of the Administrator of Correction and also responds to the Director of the Penal Institution Program. The latter is the division in charge of the daily supervision of the entire correctional system. Mr. Alvarez has been entrusted with responsibilities that include *inter alia,* direction of the "academy" for new custody officers and the recruitment, evaluation and promotions of these. He is also accountable for the design and support of all security plans for the Administration of Correction. Respondent Alvarez also provides special security assistance whenever a mass transfer of inmates takes place. He knows complainant Grajales, having met him due to several requests for prison transfers made by the latter. Alvarez opines that the complainant is the leader of a prisoners' group known as "the Grajales".

9. Sergeant Benito Torres, officers Heriberto Martínez and José Ramón García personally known Mr. Grajales. To all of them he is considered "dangerous"; to García he is also an inmate who is "difficult to manage" and who has "bad attitudes".

10. Complainant is considered a "jailhouse lawyer" by respondents, as well as by his fellow inmates. He has filed several *pro se* complaints at previous times before this Court and has drafted others on behalf of fellow inmates.

### Conclusions of Law

This Court has issued several written and oral protective orders to prevent reprisals by defendants, its agents, servants and employees against inmates that seek the vindication of their constitutional rights. See Order of May 30, 1980 (docket # 254), January 21, 1981 (docket # 542), June 26, 1984 (docket # 807), and July 9, 1984 (docket # 809). Our Order of January 21, 1981, specifically restrained "all em-

ployees, agents (and) servants of the Administration of Corrections" from "taking reprisals" against any "inmate who testifies in this case as well as those who are interviewed by plaintiffs' attorneys ... based solely on the fact that he/she has testified or has been interviewed for these proceedings". It further ordered the Administration of Correction to circulate copies of the order among the Superintendents of each penal institution or prison camp under its jurisdiction, and to orally advise each superintendent of its contents.

Every order granting an injunction is "binding upon the parties to the action, their officers, agents, servants (and) employees...." Fed.R.Civ.P. 65(d). Although it is not necessary to establish that a party's employees had *actual* notice of the injunction in order for them to be bound by it, *Shakman v. Democratic Organization of Cook County,* 533 F.2d 344, 352 (7th Cir.1976), some notice may nevertheless be required by due process. *See* Moore's *Federal Practice,* Vol. 7—Part 2, pp. 65–156 through 65–158.

■ Here, defendants were in all probability placed on actual notice of the January 21 Order's terms by its requirement that it be circulated among the Superintendents of all penal institutions and prison camps. Since the order specifically stated that it applied to "all employees" of the Administration of Correction, the Superintendents were under an obligation to notify their subordinates by posting or otherwise, and presumably did so. Under these circumstances, it is so highly improbable that defendants were unaware of our order that actual notice can be reasonably inferred. *Cf. Hill v. United States,* 33 F.2d 489, 491 (8th Cir.1929). In any event, even if there was no *actual* notice, there was sufficient *constructive* notice, given the terms of the order, to satisfy due process.

Civil contempt proceedings are an appropriate vehicle when a victorious party secures the full relief granted by the Court. *Gompers v. Bucks Stove and Range Co.,*

221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1911). Although willfulness is not required for a finding of civil contempt, civil contempt may be based on willful behavior. *United States v. Laurins,* 857 F.2d 529 (9th Cir.1988).

■ The standard of proof in civil contempt proceedings is that of "clear and convincing evidence". *United States v. Rizzo, supra.* To the Court, the events that transpired during the morning of September 13, 1988, occurred as alleged by the complainant and for the motives asserted. The staunch and extensive cross-examination to which defendants subjected Mr. Grajales, as well as the witnesses that testified on his behalf, only served to further and corroborate his complaint. The evidence presented was in the Court's opinion "clear and convincing". These witnesses were well articulated and their testimony flawless. The same cannot be said as to the witnesses on behalf of the Administration of Correction. Their theory of the case rested on the notion that nothing unusual happened during the morning of September 13, 1988. Complainant's allegations, they state, were "fabricated" to protect himself from an alleged seizure carried out on September 12, 1988, which produced an illegal "home made" weapon taken from Mr. Grajales. Although the investigation of said incident was conducted and completed on that same day, criminal charges were not filed until twenty eight days after the alleged criminal conduct took place and *after* the commencement of this hearing. These circumstances raise considerable doubts, to say the least, as to respondents' theory.

The incident of the tear gas bombs exposes even further the lack of candor on the part of respondents. Witnesses, including the very respondents, testified that the only persons who carry tear gas weapons into the institutions of the Administration of Correction are the officers of the Tactical Operations Unit of the Police of Puerto Rico.[3] On September 13, 1988, they were not called into action at Guayama to help

---

**3.** This specialized unit of the Police is called into the institutions whenever major distur-

bances or riots occur in the prison population.

squelch a riot or any other similar major disturbance. There is evidence on record that at the Guayama Institution there is a secured room or armory where firearms and other types of weapons are kept for use by the penal guards. There is an officer in charge of said room, who must make an entry into a log book every time a firearm or weapon is retrieved or returned by a penal guard. In said armory there are weapons of the type that fire tear gas bombs. Although tear gas bombs were fired inside Annex 292 on September 13,[4] there is no entry in the log book of the armory reflecting the delivery or return of any weapon to a penal guard on said date or on prior subsequent dates. (Exhibit I).

Sanctions in civil contempt proceedings may be employed for either or both of two purposes: to coerce defendants into compliance with the Court's order, and to compensate the complainant for losses sustained. *United States v. Mine Workers of America*, 330 U.S. 258, 303–304, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947); *Local 28 of Sheet Metal Workers v. E.E.O.C.*, 478 U.S. 421, 106 S.Ct. 3019, 3033, 92 L.Ed.2d 344 (1986). In civil contempt proceedings the punishment is remedial and for the benefit of the complainant. *Gompers v. Bucks Stove and Range Co., supra; Hicks ex rel. Feiock v. Feiock,* — U.S. ——, 108 S.Ct. 1423, 1429–30, 99 L.Ed.2d 721 (1988). "Once a complainant makes a showing that respondent has disobeyed a decree in complainant's favor and that damages have resulted to the complainant thereby, complainant is entitled as of right to an order in civil contempt imposing a compensatory fine." *Parker v. United States*, 153 F.2d 66, 70 (1st Cir.1946). *See also Thompson v. Cleland*, 782 F.2d 719 (7th Cir.1986); *Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc.*, 793 F.2d 1529 (11th Cir.1986), *reh. den., en banc*, 797 F.2d 982; *General Motors Corp. v. Gibson Chemical & Oil Corp.*, 627 F.Supp. 678 (E.D.N.Y.1986); *New York Times Co. v. Newspaper & Mail Deliverers' Union*, 517 F.Supp. 662 (S.D.N.Y.1981). *Accord, Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2nd Cir.1979) (District Court required to issue order in civil contempt awarding compensatory damages where complainant has shown he suffered harm because of violation of terms of injunction).

Public interest law litigation usually presents complex legal goals. For this reason, the Court must "undertake a continuing involvement requiring flexibility both in the formulation of the decree and in the determination of the appropriate response to ensuing requests for the enforcement or modification of the original order in light of changing circumstances." *Mass. Ass'n of Older Amer. v. Com'r. of Pub. Welfare*, 803 F.2d 35, 38 (1st Cir.1986).

In the case at bar we are forced to act to insure that defendants, their agents, employees and servants, and in particular custody officers, conform their conduct to the strict terms of the outstanding orders issued by this Court. The orders at stake aim to protect complainant as well as any other member of the plaintiffs' class from retaliatory actions motivated by complainants' exercise of their constitutional rights. Non-compliance with these orders creates a "chilling effect" upon complainant and other members of the class. Notice is hereby given that further non-compliance with these orders could result in the initiation of *criminal* contempt proceedings against those acting in such fashion.

However, for the time being, and in order to compensate complainant for the physical and emotional injuries suffered as a result of defendants' contumacious conduct, it is hereby

ORDERED that a compensatory fine of $125.00 be imposed on each and everyone of the named respondents in the present action, to wit: Captain Domingo Alvarez, Sergeant Benito Torres, Officer Heriberto Martínez and Officer José Ramón García;

ORDERED that the totality of this sum ($500.00) be made payable to complainant, Domingo Grajales.

IT IS SO ORDERED.

---

**4.** Finding of Fact No. 5.

**VENROD CORPORATION, Plaintiff,**

v.

**SECRETARY OF the TREASURY OF the COMMONWEALTH OF PUERTO RICO, et al., Defendants.**

**Civ. No. 88–2099 (JP).**

United States District Court, D. Puerto Rico.

Jan. 4, 1989.

Leonardo Andrade Lugo, Edgardo Colón Arrarás, Goldman & Antonetti, Santurce, P.R., for plaintiff.

María L. Jiménez Colón, Federal Litigation Div., Dept. of Justice, San Juan, P.R., for defendants.

## OPINION AND ORDER

PIERAS, District Judge.

On December 28, 1988, at 4:47 p.m., plaintiff, the Venrod Corporation, an importer and distributor of alcoholic beverages, filed this action and requested a Temporary Restraining Order against the defendants, the Secretary of the Treasury of Puerto Rico and the Director of the Puerto Rico Bureau of Alcoholic Beverages. The Court set a hearing for the following morning and instructed plaintiff's counsel to no-

tify defendants, at least orally, of the hearing. By approximately 6:30 p.m., defendants and their counsel had been notified by telephone. Transcript of Hearing on Motion for Temporary Restraining Order ("Transcript") at 6.

At the hearing the following morning, defendants appeared, represented by counsel,[1] and argued against issuance of the TRO. They were not prepared to present evidence, so all evidence alluded to and relied on herein was, in effect, *ex parte.*

## I. BACKGROUND

In its verified complaint and at the hearing, plaintiff, through its president, Waldemar Rodríguez, alleged that on May 16, 1988, plaintiff applied to defendants for the Certification of Label Approval necessary for the importation and sale of Lambrusco "Marchese D'Amore" in Puerto Rico as a "substandard wine," and that on August 1, 1988, defendant Miguel Bilbraut, the Director of the Bureau of Alcoholic Beverages, granted the permit. Verified Complaint, Exh.A. Pursuant to 13 L.P.R.A. § 6006(2)(a), the permit provided for an excise tax of $1.20 per gallon. The wine was to be fermented initially in Italy, then shipped to Tenerife, in the Canary Islands (Spain), where it was to be refermented and sugar cane alcohol was to be added. Transcript at 25.

Mr. Rodríguez further testified that upon obtaining its permit, Venrod purchased 30,000 cases of the Marchese D'Amore, and secured letters of credit and a shipping schedule geared to the Christmas season, which is the "peak" season for the consumption of such products in Puerto Rico. Transcript at 15–16. On October 24, 1988, after Venrod had irrevocably committed itself to purchase the 30,000 cases of the Marchese D'Amore, Bilbraut revoked Venrod's permit of August 1, 1988, by way of a letter stating that upon reviewing the specifications of the Marchese D'Amore label he had noticed that it did not indicate that

it was a "substandard wine," and that such information was important due to the fact that the chemical characteristics of the product had been altered by the addition of sugar cane alcohol. Verified Complaint, Exh.M. Venrod was not afforded a hearing in connection with the revocation of the permit. According to Rodríguez, he then convinced Bilbraut that there was no law or regulation in Puerto Rico which required the label to state that it was a substandard wine, and that the local companies engaged in the manufacture of the same type of wine did not include this information on their labels. On November 23, 1988, Bilbraut again wrote to Venrod, this time stating that upon consideration of the documentation submitted by Venrod with the initial application, the Marchese D'Amore fell under the category of "wine" and not "substandard wine." *Id.* Exh.O. *See* 13 L.P.R.A. §§ 6005(52) and (53). This results in a tax of $8.25 per gallon, *see* 13 L.P.R.A. § 6006(2)(b), which Rodríguez alleged would cause the wine to be uncompetitive with similar products made in Puerto Rico which pay the substandard wine tax of $1.20. This action was taken as well without notice or a hearing. Mr. Rodríguez further testified that had he been told this prior to the issuance of the permit on August 1, 1988, Venrod would not have purchased the Marchese D'Amore. Transcript at 19. The situation was causing Venrod irreparable damages insofar as that once Venrod obtained the permit, it began preselling the product to its customers and obtaining their orders for its purchase, and the revocation was adversely affecting Venrod's relationship with its clients, its credibility, and its goodwill. The situation was also causing grave cash flow problems for Venrod and would ultimately strain its relationships with its lending institutions and its suppliers. Further, Rodríguez stated that the Marchese D'Amore would spoil if kept warehoused for over six (6) months. Transcript at 21–22.

---

1. Given the short time period available for the defendants' preparation for the hearing, and despite the exemplary performance under the circumstances of defendants' counsel, the Court deems it proper to accord defendants the full protection provided by Fed.R.Civ.P. Rule 65(b) for the issuance of temporary restraining orders *ex parte* without notice.